**Exhibit B**

# DLOC NOTE

Dated as of August 15, 2024 (the "***Note Date***")

***Note Amount***: $5,000,000.00

**FOR VALUE RECEIVED**, **TIG REAPER LLC**, a Delaware limited liability company ("***Borrower***"), promises to pay to the order of **BANK MIDWEST**, a division of NBH Bank, and its successors and assigns ("***Lender***"), the principal sum stated above as the Note Amount, or so much thereof as may have been advanced by Lender, with interest thereon, on the dates and at the rates and upon the terms and conditions specified below. This DLOC Note (this "***Note***") is the DLOC Note referred to in the Loan Agreement, dated the same date as this Note, between Borrower and Lender (as it may be amended, restated, supplemented, extended or renewed from time to time, the "***Loan Agreement***") and is being executed and delivered pursuant thereto (the loan made pursuant to this Note and the Loan Agreement being referred to in this Note as the "***DLOC***"). Capitalized terms used in this Note and not defined in this Note have the meanings given to such terms in the Loan Agreement.

1. <u>Interest Rate</u>.

(a) Interest shall accrue on outstanding Draws under the DLOC (each, a "***DLOC Draw***"), from the date of each DLOC Draw, at the Interest Rate.

(b) All interest hereunder shall be computed on the basis of a 360-day year and the actual number of days elapsed (including the first day but excluding the last day). All interest hereunder shall be computed on a daily basis based upon the outstanding principal amount of the DLOC as of the applicable date of determination. Term SOFR and the Base Rate (and components thereof), as applicable shall be determined by Lender and such determination shall be conclusive absent manifest error.

(c) Lender does not warrant or accept any responsibility for, and shall not have any liability with respect to, (i) the administration, submission or any other matter related to the Base Rate, the Term SOFR Reference Rate, or Term SOFR or with respect to any rate that is an alternative or replacement for or successor to any such rate (including any Benchmark Replacement); (ii) any Benchmark Replacement Conforming Changes; or (iii) the effect of any of the foregoing (including whether any such alternative, replacement or successor rate will be similar to, or produce the same value or economic equivalence of, any of the foregoing rates or have the same volume or liquidity as did any such rate prior to its discontinuance or unavailability).

(d) Notwithstanding anything to the contrary set forth in this Note or any of the other Loan Documents, Term SOFR and Benchmark Replacement shall be subject to replacement in accordance with the terms and conditions of ***Exhibit A (Benchmark Replacement Setting)***.

(e) The following defined terms shall have the following meanings hereunder:

"***Base Rate***" means, for any day, a fluctuating rate per annum in effect for such day equal to the Spread plus the highest of (a) the "prime rate" as publicly announced for such day by JPMorgan Chase Bank, N.A. (or a successor source reasonably selected by Lender), and (b) the Federal Funds Rate plus one-half of one percent (0.5%). Any change in the Base Rate shall take effect without notice to Borrower from the effective date thereof.

"***Base Rate Period***" means, subject to ***Section 1(d)*** **(*Benchmark Replacement Setting*)** hereof, any period in which (a) SOFR, the Term SOFR Reference Rate, or Term SOFR is unavailable or cannot be determined in accordance with the definition thereof, or (b) any Applicable Law has made it unlawful, or any Governmental Authority has asserted that it is unlawful, for Lender or its applicable lending office to make DLOC Draws or maintain the DLOC whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, or Term SOFR, or to determine or charge rates based thereon. A Base Rate

Period will be deemed to have occurred and continue to exist for any Interest Period in which any of the foregoing circumstances exist as of the related Periodic Term SOFR Determination Day (unless any Applicable Law requires that such Base Rate Period be deemed to have occurred immediately upon the occurrence of any of the foregoing events, in which case, it shall so be deemed to have occurred).

"***Benchmark Replacement***" is defined in ***Exhibit A***.

"***Benchmark Replacement Conforming Changes***" is defined in ***Exhibit A***.

"***Benchmark Replacement Date***" is defined in ***Exhibit A***.

"***Business Day***" means any day that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions in such state are authorized or required by Applicable Law to close.

"***Federal Funds Rate***" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) 0%.

"***Interest Period***" means each period from a Payment Date (or, in the case of the first Payment Date, from the Note Date) to the successive Payment Date; provided, however, any Interest Period which would otherwise extend beyond the DLOC Maturity Date shall end on the DLOC Maturity Date so long as all of the Obligations have been repaid by the DLOC Maturity Date.

"***Interest Rate***" means, subject to ***Section 1(d)*** and ***Section 10***, the rate per annum (expressed as a percentage) equal to Term SOFR for the Interest Period therefor plus the Spread; provided, that, during any Base Rate Period, "Interest Rate" shall mean the Base Rate.

"***Payment Date***" means the first day of each calendar month.

"***Periodic Term SOFR Determination Day***" has the meaning specified in the definition of "Term SOFR".

"***SOFR***" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"***SOFR Administrator***" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"***Spread***" means a rate of interest equal to three- and one-half percent (3.50%).

"***Term SOFR***" means the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the first day of such Interest Period, provided however, if such day is not a U.S. Government Securities Business Day, the first U.S. Government Securities Business Day preceding such day (such day, the "***Periodic Term SOFR Determination Day***"), as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is

not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"***Term SOFR Administrator***" means the CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Lender in its reasonable discretion).

"***Term SOFR Reference Rate***" means the rate per annum determined by Lender as the forward-looking term rate based on SOFR.

"***U.S. Government Securities Business Day***" means any day except for (i) a Saturday, (ii) a Sunday, or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

2. DLOC Draw Period Interest-Only Payments. During the DLOC Draw Period, interest on outstanding DLOC Draws is payable in arrears on each Payment Date, commencing on the first Payment Date to occur after the Note Date and continuing on each subsequent Payment Date occurring prior to the last day of the DLOC Draw Period.

3. Conversion of DLOC Draws to DLOC Term Loans. All DLOC Draws outstanding on a particular Conversion Date shall be converted to a single "***DLOC Term Loan***" at that time, on the terms and conditions specified herein, with the date of such conversion being referred to as the "***DLOC Term Loan Effective Date***" for the DLOC Term Loan resulting from such conversion. "***Conversion Date***" means each of (i) the one (1) year anniversary of the Note Date, and (iii) the day (the "***Final Conversion Date***") that is the last day of the DLOC Draw Period.

4. No Separate DLOC Term Loan Notes. Each DLOC Term Loan will be represented by this Note, on the terms and conditions specified for such DLOC Term Loan herein and in the Loan Agreement, and there will not be separate promissory notes for DLOC Term Loans.

5. DLOC Term Loan Interest Rates; Payments. Each DLOC Term Loan will bear interest and be payable as follows:

(a) Applicable Interest Rate. Interest shall accrue on a particular DLOC Term Loan at the Interest Rate.

(b) DLOC Term Loan Payments; Maturity Date. Interest on the unpaid principal balance of a particular DLOC Term Loan, for the period from the DLOC Term Loan Effective Date for such DLOC Term Loan to the first Payment Date to occur following such DLOC Term Loan Effective Date, together with interest accrued on the corresponding DLOC Draws for the period from the immediately preceding Payment Date to the DLOC Term Loan Effective Date for such DLOC Term Loan, shall be due and payable on such first Payment Date. Regular monthly payments (each, a "***Monthly Payment***") for a particular DLOC Term Loan will commence on the second Payment Date to occur after the DLOC Term Loan Effective Date for such DLOC Term Loan and will continue on each Payment Date thereafter through the Payment Date occurring on September 1, 2029 (the "***DLOC Maturity Date***"). On the DLOC Maturity Date, in addition to the required Monthly Payment, Borrower shall also pay the entire remaining unpaid balance of each DLOC Term Loan; all accrued and unpaid interest to the DLOC Maturity Date for each DLOC Term Loan; any other amounts payable with respect to each DLOC Term Loan; and any other amounts then due and payable with respect to the DLOC Term Loans. **BORROWER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT A SUBSTANTIAL PAYMENT WILL BE DUE ON THE DLOC MATURITY DATE.**

(c) Monthly Payment Amounts. Each Monthly Payment will equal (i) all accrued and unpaid interest, plus (ii) principal in an amount equal to the Monthly Principal Payment. "***Monthly Principal Payment***" means, with respect to each DLOC Term Loan, an amount determined by dividing the original

principal amount of such DLOC Term Loan on the corresponding DLOC Term Loan Effective Date by the Amortization Period. "***Amortization Period***" means a period of 120 months that commences on the first Payment Date after the DLOC Term Loan Effective Date for a particular DLOC Term Loan.

6. Prepayments.

(a) Draws. Voluntary repayments of outstanding DLOC Draws are not permitted during the DLOC Draw Period.

(b) DLOC Term Loans. Except as may otherwise be expressly provided in this Note and the other Loan Documents, Borrower may not make any prepayment of any DLOC Term Loan except as follows: (i) prepayments must be made on a Payment Date (a "***Permitted Prepayment Date***"); (ii) Borrower must give Lender at least 30 days' prior written notice of the proposed prepayment; (iii) the prepayment must be for the full outstanding principal balance of such DLOC Term Loan (except that partial prepayments are permitted in the case of (A) payments of Insurance Proceeds that are applied to principal on such DLOC Term Loan; and (B) other mandatory prepayments, if any, required pursuant to any of the Loan Documents and that are applied to principal on such DLOC Term Loan); and (iv) the prepayment must be accompanied by payment to Lender of the following: (A) interest on the prepaid principal of such DLOC Term Loan through the Permitted Prepayment Date; and (B) any and all costs, fees, and other expenses, including late fees, due and payable with respect to the DLOC Term Loan. **PREPAYMENTS ARE ONLY ALLOWED ON PERMITTED PREPAYMENT DATES AND INTEREST ON THE PREPAYMENT AMOUNT MUST BE PAID THROUGH THE PERMITTED PREPAYMENT DATE. IF LENDER AGREES TO ACCEPT A PREPAYMENT ON A DATE OTHER THAN A PERMITTED PREPAYMENT DATE THERE WILL BE NO REDUCTION IN THE AMOUNT OF INTEREST REQUIRED TO BE PAID AS PROVIDED ABOVE. ACCORDINGLY, AS A FURTHER CONDITION TO THE PREPAYMENT AND IN ADDITION TO ALL OTHER AMOUNTS PAYABLE IN RESPECT OF SUCH PREPAYMENT, BORROWER WILL PAY TO LENDER THE AMOUNT OF INTEREST THAT WOULD HAVE ACCRUED ON THE DLOC TERM LOAN BEING PREPAID, BUT FOR THE PREPAYMENT, FROM THE DATE OF PREPAYMENT TO THE NEXT PERMITTED PREPAYMENT DATE.**

(c) Intentionally Omitted.

(d) Application of Prepayment Amounts. Subject to the provisions of ***Section 1.6(c)*** of the Loan Agreement: (i) amounts paid pursuant to ***Section 6(b)(iv)*** shall be applied in payment of the amounts specified therein; (ii) all prepaid principal with respect to such DLOC Term Loan shall be applied to the unpaid principal balance of such DLOC Term Loan; ***provided, however***, that any permitted partial prepayment of principal shall be applied to principal in the inverse order of maturity, such that the scheduled Monthly Payment amounts for such DLOC Term Loan otherwise calculated do not change; and (iii) all other payments pursuant to this Note with respect to such DLOC Term Loan shall be applied first to accrued and unpaid interest on such DLOC Term Loan and the balance to reduction of principal on such DLOC Term Loan, in the inverse order of maturity.

7. General Payment Provisions. All payments due pursuant to this Note shall be payable at the place and in the manner provided in ***Section 1.6*** of the Loan Agreement and otherwise in accordance with the provisions of that Section, which Section is incorporated herein by this reference.

8. Non-Conforming Payments. Credit to Borrower's account may be delayed if the payment is not made as provided above or if not accompanied by the correct invoice number. Lender may, at its sole option, refuse any amount tendered by Borrower that is not in the required form or in the exact amount of the required payment. Delayed credit may cause Borrower to incur a late payment fee. Credit for payments is subject to final payment by the institution on which the item of payment was drawn. **UNAUTHORIZED FORMS OF PAYMENT, SUCH AS CASH, CASHIER'S CHECKS, OFFICIAL BANK CHECKS, TELLER'S CHECKS, CERTIFIED CHECKS, TRAVELERS' CHECKS, AND MONEY ORDERS, ARE NOT ACCEPTABLE FORMS OF PAYMENT AND MAY BE RETURNED TO BORROWER AT BORROWER'S RISK OF LOSS**.

9. Disputed Payments. All written communication concerning disputed amounts, including any check or other payment instrument that (a) indicates that the written payment constitutes "payment in full" or is tendered as full satisfaction of a disputed amount or (b) is tendered with other conditions or limitations must be mailed or delivered to Lender at the following address and not to the address shown on the invoice as the address for remitting payments, unless Lender otherwise directs: Bank Midwest, a division of NBH Bank, c/o NBH Bank, P.O. Box 26528, Kansas City, MO 64196-6528.

10. Default Interest. Effective immediately upon (a) the occurrence of any Event of Default under ***Section 6.1(f)*** of the Loan Agreement; or (b) the delivery of a notice by Lender to Borrower during the continuance of any other Event of Default and, in each case, for as long as such Event of Default shall be continuing, the outstanding principal balance of this Note, including all outstanding DLOC Draws and DLOC Term Loans shall bear interest at a rate equal to **2% *added to*** the interest rate that is otherwise applicable to outstanding DLOC Draws and DLOC Term Loans, as applicable, from time to time, payable on demand or, in the absence of demand, on the date(s) that would otherwise be applicable to outstanding DLOC Draws and DLOC Term Loans, as the case may be.

11. Late Fees. If Borrower fails to make any payment pursuant to this Note or any other Loan Document on or before the 5th day after the due date for such payment, then Borrower shall pay Lender a late fee equal to **5%** of such past-due payment. Such late fee will be immediately due and payable and is in addition to any other charges, costs, fees, and expenses that Borrower may owe as a result of the late payment, including the imposition of a default rate of interest pursuant to this Note or any other Loan Document.

12. Waivers. Borrower and all endorsers, guarantors, and sureties of this Note waive presentment, demand for payment, notice of dishonor, notice of protest, and protest, notice of intent to accelerate, notice of acceleration and all other notices or demands in connection with delivery, acceptance, performance, default or endorsement of this Note.

13. Lender Computations Final. Lender's computations, in accordance with the terms of this Note and the Loan Agreement, of interest rates, Monthly Payment amounts, and final payment amounts, prepayment fees, and other amounts due and owing from Borrower to Lender shall be final and conclusive, absent manifest error.

14. Maximum Rate of Interest. Anything herein to the contrary notwithstanding, the obligations of Borrower hereunder or pursuant to any other Loan Document shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment would be contrary to the provisions of any Applicable Law limiting the highest rate of interest which may be lawfully contracted for, charged or received by Lender, and in such event Borrower shall pay Lender interest at the highest rate permitted by Applicable Law.

15. Inconsistencies. If there are any inconsistencies between the terms of this Note and the other Loan Documents, the provisions of this Note shall control.

16. Funding Losses. Borrower agrees to reimburse Lender and to hold Lender harmless from any reasonable and customary loss or expense which Lender may sustain or incur as a consequence of (a) the failure of Borrower to borrow on the DLOC after Borrower has given a notice to borrow; (b) the failure of Borrower to make any prepayment after Borrower has given a notice of prepayment; (c) the failure of Borrower to make any payment or mandatory prepayment of principal of the DLOC (including payments made after any acceleration thereof); or (d) the prepayment of the DLOC on a day which is not a Payment Date, as applicable. If a Rate Contract has been entered into in connection with this Note, any full or partial prepayments of principal amounts due under this Note may require termination or adjustment of the Swap Obligations under such Rate Contract and may result in a payment due from Borrower per the terms and conditions of such Rate Contract.

17. Increased Costs. If on or after the date hereof the adoption of any Applicable Law, or any change therein, or any change in the interpretation or administration thereof by any Government Authority, including the central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Lender with any request or directive of any such authority (a) shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including, without limitation, any such requirement imposed by the Board of Governors of the Federal Reserve System of the United States) against assets of, deposits with or for the account of,

or credit extended by, Lender; or (b) shall impose on Lender any other condition affecting the applicable Interest Rate or its obligation to make the DLOC; and the result of any of the foregoing is to increase the cost to Lender of making or maintaining the DLOC at the Interest Rate, or to reduce the amount of any sum received or receivable by Lender under this Note with respect thereto, by an amount deemed by Lender to be material, then, within 15 days after delivery of written evidence of such increase or reduction and demand by Lender, Borrower shall pay to Lender such additional amount or amounts as will compensate Lender for such increased cost or reduction.

18. Capital Adequacy. If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase-in of, any Applicable Law of any court, central bank, regulator or other Government Authority affects or would affect the amount of capital required or expected to be maintained by Lender, or person controlling Lender, and Lender determines (in its sole discretion) that the rate of return on its or such controlling person's capital as a consequence of its commitments or the DLOC made by Lender is reduced to a level below that which Lender or such controlling person could have achieved but for the occurrence of any such circumstance, then, in any such case upon notice from time to time by Lender to Borrower, Borrower shall within 15 days after delivery of written evidence by Lender in reasonable detail of such circumstance pay directly to Lender additional amounts sufficient to compensate Lender or such controlling person for such reduction in rate of return. A statement of Lender as to any such additional amount or amounts (including calculations thereof in reasonable detail) shall, in the absence of manifest error, be conclusive and binding on Borrower. In determining such amount, Lender may use any method of averaging and attribution that it (in its sole discretion) shall deem applicable.

19. Applicability of General Provisions. All provisions of the Article in the Loan Agreement titled "***General Provisions***", as well as the defined terms in the Loan Agreement, including in the Schedule of Defined Terms attached thereto, apply to this Note, the same as if such provisions were set forth in full in this Note.

[SIGNATURE PAGE(S) FOLLOW]

**IN WITNESS WHEREOF**, Borrower has executed this Note as of the date stated above.

**BORROWER:**

**TIG REAPER LLC**, a Delaware limited liability company

By: ______________________________
Manisha Patel, Member

By: ______________________________
Jiger Patel, Member

# EXHIBIT A

## BENCHMARK REPLACEMENT SETTING

(a) Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Note or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Note or any other Loan Document.

(b) Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, Lender will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Note or any other Loan Document.

(c) Notices; Standards for Decisions and Determinations. Lender will promptly notify Borrower of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes. Lender will promptly notify Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to subsection (d) below. Any determination, decision or election that may be made by Lender pursuant to this ***Exhibit A***, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from any other party to this Note or any other Loan Document, except, in each case, as expressly required pursuant to this ***Exhibit A***.

(d) Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by Lender in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is or will be no longer representative, then Lender may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then Lender may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e) Benchmark Unavailability Period. During a Benchmark Unavailability Period, interest on the DLOC shall accrue at the Base Rate.

(f) Certain Defined Terms. As used in this Note, each of the following capitalized terms has the meaning given to such term below:

"***Available Tenor***" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Note or

(y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to subsection (d) above.

"***Benchmark***" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (a) of this ***Exhibit A***.

"***Benchmark Replacement***" means with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by Lender for the applicable Benchmark Replacement Date:

(a) Daily Simple SOFR; or

(b) the sum of: (i) the alternate benchmark rate that has been selected by Lender and Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated or bi-lateral credit facilities and (ii) the related Benchmark Replacement Adjustment.

"***Benchmark Replacement Adjustment***" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero), that has been selected by Lender and Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated or bi-lateral credit facilities.

"***Benchmark Replacement Conforming Changes***" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of ***Section 16*** of this Note and other technical, administrative or operational matters) that Lender decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of this Note and the other Loan Documents).

"***Benchmark Replacement Date***" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b) in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be no longer representative or not to comply with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; provided, that such non-representativeness or non-compliance will be determined by reference to the most recent statement or publication referenced in such clause (c) even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Transition Event***" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer, or as of a specified future date will no longer be, representative or do not, or as a specified future date will not, comply with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Unavailability Period***" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this ***Exhibit A*** and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with this ***Exhibit A***.

"***Daily Simple SOFR***" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by Lender in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans;

provided, that if Lender decides that any such convention is not administratively feasible for Lender, then Lender may establish another convention in its reasonable discretion.

"***Relevant Governmental Body***" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"***Unadjusted Benchmark Replacement***" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.