# **Exhibit C**

# LOAN AGREEMENT

THIS **LOAN AGREEMENT** (as it may be amended, restated, supplemented, extended or renewed from time to time, this "***Agreement***") is made as of August 15, 2024, between **BANK MIDWEST**, a division of NBH Bank ("***Lender***"), and **TIG REAPER LLC**, a Delaware limited liability company (***Borrower***").

**FOR VALUABLE CONSIDERATION**, the parties agree as follows:

## ARTICLE 1
## THE CREDIT FACILITIES

1.1 The Credit Facilities; Collateral. Lender agrees to make the loan or loans identified in the following "***Loan Table***" (each, a "***Loan***" and collectively, the "***Credit Facilities***") to Borrower on the terms and conditions in this Agreement and the other Loan Documents. Each Loan will be evidenced by a separate promissory note (each, a "***Note***") to Lender. References in the Loan Documents to a "Loan" and a "Note" are to each such Loan and Note. Notwithstanding that this Agreement may provide for multiple Loans, all Loans constitute one general obligation of Borrower. Borrower agrees to borrow and repay the Loan, with interest, in accordance with the Note, this Agreement, and the other Loan Documents. The Credit Facilities will be secured by the Collateral. At Closing, the Collateral will include the Collateral described in the "***Collateral Table***" attached as ***Exhibit 1.1***, as well as all other Collateral described in the Loan Documents.

| **Loan Table** | |
|---|---|
| **Loan** | "***Maximum Loan Amount***" |
| Term Loan A | $1,650,000.00 |
| DLOC | $5,000,000.00 |

1.2 Term Loan A.

(a) Term Loan and Note. Lender agrees to make the Loan described in this Section ("***Term Loan A***" or, for purposes of this Section, this "***Term Loan***") to Borrower on the terms and conditions set forth in this Section and as otherwise provided in this Agreement. This Term Loan will be evidenced by Borrower's Term Loan A Note (the "***Term Loan A Note***") in the Maximum Loan Amount for this Term Loan.

(b) Purpose. Borrower agrees to use the proceeds of this Term Loan exclusively for refinancing existing debt at Closing, and to fund certain other permitted amounts at Closing (to the extent herein provided), in accordance with the terms of this Agreement and the other Loan Documents.

(c) Term Loan Amount. This Term Loan will be in an amount (the "***Term Loan A Amount***") equal to the lesser of (a) $1,650,000.00 (the "***Maximum Loan Amount***"); or (b) the sum of the following, each to the extent approved by Lender in its sole discretion, together with such other amounts, if any, as Lender may, in its sole discretion, approve to fund at Closing: (i) 100% of the existing debt being for the Sites refinanced at Closing; (ii) the loan fees payable by Borrower at Closing for this Loan; (iii) usual and customary closing costs and expenses paid or to be paid by Borrower to Lender at or prior to Closing; and (iv) broker's commissions payable by Borrower at or prior to Closing to JG Franchise Consulting, LLC in the amount equal to 1.00% of the aggregate amount of the Term Loan A Amount and the DLOC Commitment Amount.

(d) Draw Request. Prior to Closing, Borrower shall deliver to Lender a complete, executed "***Closing Draw Request***" (using Lender's prescribed form) for disbursement of the Term Loan proceeds. At

Closing, Lender will fund the Term Loan proceeds by wire transfer in accordance with the instructions contained in such Closing Draw Request.

(e) Closing Fee. At Closing, Borrower will pay Lender a closing fee equal to 0.20% of the Term Loan A Amount.

1.3 The DLOC.

(a) DLOC Commitment; DLOC Note. Lender agrees to make the Loan described in this Section (the "***DLOC***") available to Borrower on the terms and conditions set forth in this Agreement. The DLOC will be in an amount equal to the Maximum Loan Amount for the DLOC specified in the Loan Table (the "***DLOC Commitment Amount***"). The DLOC, and each DLOC Term Loan described below, will be evidenced by Borrower's DLOC Note in the DLOC Commitment Amount (the "***DLOC Note***"). The DLOC is a straight line of credit, not a revolving line of credit. Accordingly, principal amounts repaid may not be reborrowed.

(b) DLOC Purpose. The DLOC will only be made available, and Borrower agrees to use the proceeds of the DLOC, exclusively to finance, from time to time: (i) the acquisition of one or more new sites for the use and operation by Borrower as a Permitted Concept (each, an "***Acquisition***", with each new site being an "***Acquisition Parcel***"), it being agreed, however, that Acquisitions are restricted to leasehold sites only and that DLOC proceeds may not be used to acquire fee real property; and/or (ii) one or more projects for the development, remodeling, re-imaging, refurbishing, or re-equipping of Sites for use as a Permitted Concept (each, a "***Development Project***", with each Site being a "***Development Site***"). DLOC proceeds may not be used to refinance existing debt.

(c) DLOC Draws and Draw Requests. Borrower may request Draws under the DLOC (each, a "***DLOC Draw***") during the DLOC Draw Period set out in the following table, subject to the limitations stated herein. For each DLOC Draw, Borrower shall provide Lender with a "***DLOC Draw Request***" in the form attached as ***Exhibit 1.3(c)*** (or such other form as Lender may then require).

| | |
|---|---|
| "***DLOC Draw Period***": The period beginning at Closing and ending on: | August 15, 2026 |
| Maximum DLOC Draws allowed per calendar month: | One. |
| Maximum permitted DLOC Draws during DLOC Draw Period: | 24 |
| Minimum DLOC Draw Amount: | $50,000, unless Lender otherwise agrees. |
| Limit on aggregate amount of DLOC Draws for an Acquisition: | 75% of the purchase price of each Acquisition Parcel, as approved by Lender in its sole discretion. |
| Limit on aggregate amount of DLOC Draws for a Development Project relating to the development of new Sites: | 75% of the Development Project costs, as approved by Lender in its sole discretion. |
| Limit on aggregate amount of DLOC Draws for a Development Project relating to the remodeling, re-imaging, refurbishing or re-equipping of existing Sites: | 100% of the Development Project costs, as approved by Lender in its sole discretion. |

Notwithstanding the foregoing, Borrower shall not be entitled to any further DLOC Draws for a particular Development Project after the earlier of (i) 30 days following the date of Final Completion of such Development Project; or (ii) the last day of the DLOC Draw Period.

(d) Draw Conditions; Funding. Lender's obligation to fund any DLOC Draw is subject to Lender's satisfaction with or waiver of, in Lender's sole discretion, each of the DLOC Draw Conditions

listed on ***Exhibit 1.3(d)***. Lender will fund each DLOC Draw within five Business Days after Lender's receipt of a complete, executed DLOC Draw Request and Lender's determination that all DLOC Draw Conditions have been met, such funding to be by wire transfer in accordance with the instructions stated in the DLOC Draw Request.

(e) No Excess Funding; Repayment. Lender's obligation to fund DLOC Draws will not at any time exceed the DLOC Commitment Amount and in no event will Borrower be entitled to any DLOC Draw if funding such DLOC Draw would result in the DLOC Commitment Amount being exceeded. On any date on which the aggregate principal amount of DLOC Draws exceeds the DLOC Commitment Amount, Borrower shall, immediately upon demand by Lender, pay Lender an amount equal to or greater than such excess, which amount shall be applied to reduce the total amount of outstanding DLOC Draws.

(f) DLOC Fees; Unused Line Fees. At Closing, Borrower will pay Lender a DLOC fee equal to 0.20% of the DLOC Maximum Loan Amount. Until the expiration of the DLOC Draw Period, Borrower shall also pay to Lender an unused commitment fee (the "***Unused Commitment Fee***") for each day, in an amount equal to: (i) the excess, if any, of the daily balance of the DLOC Commitment Amount during the preceding calendar quarter over the daily principal balance of outstanding DLOC Draws (not converted to a DLOC Term Loan) during the preceding calendar quarter multiplied by (ii) 0.15% per annum. The Unused Commitment Fee will accrue and be payable quarterly in arrears on the first day of each calendar quarter following the date hereof.

(g) DLOC Term Loans. Outstanding DLOC Draws will be converted to amortizing term loans at the times and on the terms and conditions specified in the DLOC Note (each, a "***DLOC Term Loan***"). The DLOC Commitment Amount will be reduced dollar for dollar by the amount of the DLOC Term Loan as of such conversion date.

(h) Development Projects. All work associated with a particular Development Project shall be diligently undertaken, pursued, and finally completed at Borrower's sole cost and expense, in a good and workmanlike manner, Lien free, using licensed contractors, and in material compliance with all Applicable Law, as well as the requirements of the Franchise Agreement for the Development Site and, if applicable, the Lease for such Development Site. "***Final Completion***" of a particular Development Project shall be deemed to have occurred at such time as (i) all work associated with the Development Project shall have been completed in accordance with the requirements of this Agreement and the other Loan Documents; and (ii) the Development Site and the business to be conducted at such Development Site shall be open for business to the public for its intended use as a Permitted Concept. Within 30 days after Final Completion of a particular Development Project, Borrower, at Borrower's sole cost and expense, shall deliver to Lender each of the Final Completion Deliverables also listed on ***Exhibit 1.3(d)***, to the extent not previously provided to Lender.

(i) Accordion. Borrower has the right to request (the "***Request***") an increase of the DLOC Committed Loan Amount by up to $3,350,000 (and up to 24 months extension on the DLOC Draw Period), concurrently with Borrower's delivery of the Financial Statements containing Fiscal Year end 2025 data and other data which Lender may require, which approval shall be subject to the satisfaction of the following conditions of Lender: (i) no Event of Default shall have occurred or be continuing and no Default shall have occurred since the Closing Date; (ii) Borrower shall have (measured as of Fiscal Year end 2025) an Effective Leverage Ratio of less than 5.00:1; (iii) Lender shall have approved the Request as determined in Lender's sole and absolute discretion; and (iv) such other terms and conditions as required by Lender in its sole discretion.

1.4 Draws and Draw Requests Generally. Lender shall have absolutely no duty or obligation to disburse any Loan proceeds (each such disbursement, a "***Draw***") unless and until Borrower has first submitted to Lender a properly completed and executed draw request in the form required by this Agreement (each, a "***Draw Request***"). Lender shall be entitled to fully rely and act on each Draw Request provided by or on behalf of Borrower and shall have no duty to verify the content of or accuracy of information contained in any such Draw Request, the authority of the person executing such Draw Request or the identity of the sender thereof. Lender does not have and is not undertaking any obligation whatsoever to Borrower to verify the source of a Draw Request provided to Lender or to detect errors in transmission or content, including discrepancies between account names and numbers.

1.5 Transaction Costs; Deposits. Borrower shall pay Lender, at or before Closing, all reasonable out-of-pocket costs and expenses incurred by or on behalf of Lender in connection with Lender's underwriting and closing due diligence and the negotiation, documentation, and closing of the Credit Facilities (including in connection with Lender's evaluation of and determinations with respect to the Closing conditions) (the "***Transaction Costs***"). Transaction Costs include the following, as applicable: (a) Lender's outside legal counsel fees; (b) expenses for UCC search reports, title searches, and title insurance; (c) escrow, recording, and filing fees; (d) transfer or mortgage taxes (if any); (e) costs of site inspections, inspection reports, surveys, appraisals, flood certifications, environmental reports and testing, and other due diligence required by Lender; and (f) costs and fees of consultants and other professional advisers retained by Lender. At Closing, all deposits paid by Borrower prior to entering into this Agreement, other than rate lock fee deposits (if any), shall be applied to pay Transaction Costs and any other fees, costs and expenses then payable by Borrower. If the deposit exceeds the sum of such items, the excess will be refunded at Closing.

1.6 General Payment Provisions.

(a) Manner and Place; No Deductions. Principal, interest, and all other amounts due to Lender from time to time under the Notes, this Agreement, and the other Loan Documents, including each Monthly Payment due under the Notes (each, a "***Payment***") shall be made by Automated Clearing House ("***ACH***") debit (and Borrower agrees to execute and deliver to Lender such authorizations and agreements as Lender may require to establish such ACH arrangements) unless Lender gives prior written consent, in its sole discretion, for Payments to be made by wire transfer. Any Payment made by wire transfer and not received by Lender prior to 12:00 o'clock noon (local Greenwood Village, Colorado, time) may, in Lender's sole discretion, be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue. All Payments, including Payments made by ACH debit, shall be in U.S. dollars and shall be made from a business deposit account in Borrower's name at a U.S. bank. All Payments shall be made without deduction of present and future Taxes (such amounts to be paid by Borrower) and without any other abatement, reduction, setoff, defense, counterclaim, deferment or recoupment.

(b) Application of Payments Generally. Except as otherwise provided in ***subsection (c)*** below: (i) all Payments of principal and interest required to be made pursuant to a particular Note shall be applied first to accrued and unpaid interest and then to principal; (ii) Payments by or on behalf of Borrower for fees, costs, and other expenses payable pursuant to any Loan Document, including Payments with respect to Transaction Costs, Closing fees and expenses, and other amounts payable by a Credit Party pursuant to any provision of the Loan Documents, shall be applied to the applicable fee, cost or other expense; and (iii) if Lender receives any other Payment, including Collateral proceeds and principal prepayments, Lender shall apply such Payment in such order, manner, and amounts as is specifically provided in the applicable Loan Document pursuant to which such Payment is made, or, in the absence of such a provision, in such order, manner, and amounts as Lender, in its sole discretion, may determine.

(c) Application of Payments After Default. Any other provision of this Agreement, any Note or any other Loan Document to the contrary notwithstanding, during such time as a Default has occurred and is continuing, all Payments shall be applied in such order and manner and in such amounts as Lender, in its sole discretion, may determine.

## ARTICLE 2
## CLOSING

2.1 Closing. The closing (the "***Closing***") with respect to all of the Loans will occur within three Business Days following satisfaction (or waiver by Lender) of each of the closing conditions (collectively, the "***Closing Conditions***") listed on the attached ***Exhibit 2.1***, regardless of whether a Draw under a particular Loan is made at Closing. The date on which the Closing occurs and Draws, if any, to be made at Closing are funded is the "***Closing Date***." Borrower hereby authorizes Lender to insert the Closing Date on the first page hereof, as the date hereof, and in the various Loan Documents, including the Notes, as the date thereof.

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES**

Borrower acknowledges and agrees that the representations and warranties in this Article are a material consideration to Lender; that Lender is relying on their correctness and completeness in entering into this Agreement and making the Credit Facilities and each Draw available to Borrower; and that these representations and warranties are true and accurate as of the date hereof, will be true and accurate as of the Closing, as if made at Closing, and will survive the Closing, regardless of any investigation or inspection by Lender. Accordingly, Borrower represents, warrants, and certifies to and covenants with Lender that:

3.1 Borrower Status. Borrower's exact legal name is set forth on the signature page hereof. Borrower is a domestic U.S. entity, validly existing and in good standing under the laws of the state of its formation, is duly qualified and licensed to do business in the state where each Site is located, and has full power and authority to enter into and perform its obligations under the Loan Documents to which it is a party. Borrower's chief executive office and principal place of business is at the location set forth on the signature page hereof.

3.2 Due Authorization, Execution and Delivery. The Loan Documents have been duly authorized and validly executed and delivered by Borrower. The individual(s) executing the Loan Documents on behalf of Borrower have been duly authorized to do so in accordance with resolutions duly adopted by Borrower's board of directors (or similar governing body), members, or partners, as the case may be.

3.3 No Conflicts; No Defaults. The authorization, execution, delivery, consummation, and performance by Borrower of the Loan Documents does not and will not conflict with, violate, or breach (a) any provision of Borrower's organizational documents; (b) any Applicable Law; or (c) any Contractual Obligation of Borrower. Borrower is not in default under and, to the best of Borrower's knowledge, no event has occurred that, with the giving of notice or the passage of time, or both, would constitute a default under any Contractual Obligation of Borrower.

3.4 Binding Obligations. This Agreement and the other Loan Documents to which a Credit Party is a party constitute the legal, valid and binding obligations of such Credit Party, enforceable against such Credit Party in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally, and general principles of equity.

3.5 Litigation and Condemnation. There is no action, suit, investigation, proceeding or arbitration at law or in equity, including condemnation proceedings or proceedings in lieu of condemnation, pending or, to the best of Borrower's knowledge, threatened against or affecting (a) any Credit Party or any of its or their assets or revenues; or (b) any of the Loan Documents or any of the transactions contemplated thereby.

3.6 Administrative, Criminal and Governmental Matters and Investigations. There are no administrative or criminal matters or investigations, government investigations or audits, or other similar matters currently pending, or, to the best of Borrower's knowledge, threatened that involve any Credit Party nor has any Credit Party been involved in any such matters within the past seven years.

3.7 Bankruptcy and Similar Matters. There are no bankruptcy, insolvency, or similar proceeding currently pending or, to the best of Borrower's knowledge, threatened that involve any Credit Party. During the past seven years: (a) no assets of any Credit Party have been the subject of any foreclosure or similar proceeding or been transferred by deed in lieu; (b) no Credit Party has filed (or had filed against such Credit Party) a petition under the U.S. Bankruptcy Reform Act of 1978, 11 U.S.C. §101, *et seq*. (the "***Bankruptcy Code***") or obtained a discharge of its debts under the Bankruptcy Code; and (c) no Person that is a principal officer, executive, member, manager or equity owner of a Credit Party held a similar position in an entity that, during the time such Person held such position or within one year after leaving such position, filed (or had filed against it) a petition under the Bankruptcy Code or that obtained a discharge of its debts under the Bankruptcy Code.

3.8 Solvency. Both before and after giving effect to consummation of the transactions contemplated by the Loan Documents to be consummated at or concurrently with the Closing and the payment and accrual of all

Transaction Costs, and other costs, fees, and expenses payable in connection with the foregoing, the Credit Parties taken together, and Borrower, individually, are Solvent.

3.9 Anti-Money Laundering; Anti-Terrorism. Each Credit Party and its Affiliates (each, an "***AML Party***") is and will remain in compliance with the following (collectively, the "***AML Requirements***"): all U.S. economic sanctions laws and executive orders; all regulations promulgated by the U.S. Office of Foreign Assets Control ("***OFAC***"); and all applicable anti-money laundering and counter-terrorism provisions of the Bank Secrecy Act, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56, and all rules and regulations issued pursuant to such laws, including those relating to "know your customer", anti-money laundering, and anti-terrorism. No AML Party is or will become a Person (a) included by OFAC on the list of Specially Designated Nationals and Blocked Persons (the "***SDN List***") or who is otherwise the target of U.S. economic sanctions laws, such that, in either case, a U.S. Person cannot engage in business transactions with such Person; or (b) that is Controlled by, or acting, directly or indirectly, for or on behalf of, any Person on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions, such that entry into or performance under any Loan Document would violate Applicable Law. For purposes of this Section and ***Section 4.14***, "Affiliate" does not include equity owners of any entity that is publicly traded on a recognized national U.S. stock exchange.

3.10 Title to Assets; Permitted Exceptions. Borrower owns all assets reflected in its most recent balance sheet delivered to Lender, except for assets disposed of in the ordinary course of business since the date of such balance sheet. Borrower is the owner of all of the Collateral, free and clear of all Liens and other matters affecting title to such assets, other than the Permitted Exceptions.

3.11 Outstanding Indebtedness. As of the Closing Date and after giving effect to the Closing, Borrower has no outstanding Indebtedness, other than (a) the Obligations; and (b) trade debt incurred and paid in the ordinary course of business and in any event within 60 days after incurrence.

3.12 Compliance with Laws; Permits. Each Site and the operations of each Credit Party at such Site comply with all Applicable Law, except for such noncompliance that has not had, and could not reasonably be expected to have, a Material Adverse Effect. All governmental permits required to use and operate such Site for the Permitted Concept, including liquor licenses, if any, have been obtained and are in full force and effect, except for permits, the failure of which to obtain or maintain has not had, and could not reasonably be expected to have, a Material Adverse Effect.

3.13 Site Conditions, Zoning, Access, and Utilities. Each Site, including all buildings and other improvements associated with such Site, is in good condition and repair; well maintained, ordinary wear and tear excepted; fully equipped and operational; free (to the best of Borrower's knowledge) from structural defects; and safe and properly lighted. Each Site is unconditionally zoned by the appropriate Government Authority for the use of such Site for the Permitted Concept. Permanent, legal access is available to each Site from a physically open and dedicated public right-of-way. Adequate public or private utilities are available at each Site to permit operation of such Site as a Permitted Concept, and all utility connection fees and use charges have been paid in full.

3.14 Franchise Agreement. Borrower has delivered to Lender a fully executed, complete copy of each Franchise Agreement as of the Closing Date. Upon execution, and/or Lender's request, from time to time, Borrower shall deliver to Lender a fully executed, complete copy of each Franchise Agreement. Each Franchise Agreement is in full force and effect, the entire interest of the franchisee thereunder is owned by one or more of the Credit Parties, and such interest has not been assigned, transferred, mortgaged, or otherwise encumbered other than pursuant to Lender's Liens. No notice of default from Franchisor has been received by any Credit Party with respect to any Franchise Agreement that has not been cured, and no notice of default to Franchisor has been given that has not been cured. To the best of Borrower's knowledge, no event has occurred and no condition exists, including with respect to any required remodeling or re-imaging, that, with the giving of notice or the lapse of time or both, would constitute a default under any Franchise Agreement.

3.15 Lease Status. Borrower has delivered to Lender a fully executed, complete copy of each Lease as of the Closing Date. Upon execution, and/or Lender's request, from time to time, Borrower shall deliver to Lender a fully executed, complete copy of each Lease. Each Lease is in full force and effect, Borrower is the sole owner of the

entire leasehold interest thereunder, and such interest has not been assigned, transferred, subleased, mortgaged, or otherwise encumbered other than pursuant to Liens in Lender's favor. No notice of default from Lessor has been received by any Credit Party that has not been cured and no notice of default to Lessor has been given that has not been cured. To the best of Borrower's knowledge, no event has occurred and no condition exists, including with respect to any required remodeling or re-imaging, that, with the giving of notice or the lapse of time or both, would constitute a default under any Lease. The Lease is the only agreement between Lessor and Borrower with respect to the Leased Site subject to such Lease.

3.16 Taxes. All federal, state, local and foreign income, franchise and other material tax returns and reports (collectively, "***Tax Returns***") required to be filed by any Tax Affiliate have been filed with the appropriate Government Authorities, all such Tax Returns are true and correct in all material respects, and all Taxes reflected therein or otherwise due and payable have been paid prior to the date on which any Liabilities may be added thereto for non-payment, except to the extent subject to a Good Faith Contest. No Tax Return is under audit or examination by any Government Authority and no notice of such an audit or examination or any assertion of any claim for Taxes has been given or made by any Government Authority. Proper and accurate amounts have been withheld by each Tax Affiliate from their respective employees for all periods in full and complete compliance with Applicable Law, and such withholdings have been timely paid to the respective Government Authorities. No Tax Affiliate has participated in a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b) or has been a member of an affiliated, combined or unitary group other than the group of which a Tax Affiliate is the common parent. "***Tax Affiliate***" means Borrower and its subsidiaries (if any) and any Borrower Affiliate with which Borrower files or is eligible to file consolidated, combined or unitary tax returns. "***Taxes***" means all taxes, including income taxes, excess profits taxes, sales taxes, gross receipts taxes, payroll taxes, withholding taxes, ad valorem real and personal property taxes and assessments, and all other taxes, duties, imposts, levies, assessments, deductions, withholdings, and charges imposed by any Government Authority, and all Liabilities with respect thereto, excluding taxes imposed on or measured by the Lender's net income.

3.17 Evaluation Information. All information provided to Lender by or on behalf of any Credit Party in connection with the Credit Facilities (collectively, the "***Evaluation Information***") is correct and complete in all material respects as of the date thereof. Borrower acknowledges that Lender is relying on the Evaluation Information in entering into this Agreement and making the Credit Facilities available to Borrower. None of the Credit Parties has any knowledge of any material change in any of the Evaluation Information that has not been disclosed to Lender in writing.

3.18 Full Disclosure. There is no fact known to any Credit Party that materially and adversely affects the business, operations, assets or condition (financial or otherwise) of any of the Credit Parties that has not been disclosed herein or in the Evaluation Information. None of the representations or warranties made by any Credit Party in the Loan Documents or any exhibit, report, statement or certificate furnished by or on behalf of any Credit Party pursuant thereto, as of the date such representations and warranties are made or deemed made, contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

3.19 Commercial Purpose of Credit Facilities. The purpose of the Credit Facilities is a commercial business purpose and not a personal, family, or household purpose. No portion of the Collateral is being used by Borrower or any other Person for any personal, family or household purposes.

3.20 ERISA. None of the Credit Parties maintains, or has any Liabilities with respect to, any employee benefit plan or multiemployer plan, as defined in the Employee Retirement Income Security Act of 1974 ("***ERISA***").

3.21 Non-Foreign Status. Borrower is not a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate" or "foreign person" as those terms are defined by the Internal Revenue Code of 1986.

3.22 Hazardous Waste. With respect to each Site and all business and operations conducted thereon, Borrower and each other Credit Party is compliant with the provisions of all applicable environmental, health and safety laws, rules, regulations and ordinances. There are no hazardous waste materials, toxic materials, hazardous waste dump sites or toxic or chemical waste cleanup requirements currently on or currently being conducted on the

Site. Neither Borrower nor any other Credit Party has any knowledge that such Site has ever been the subject of an environmental protection agency (state or federal) inquiry, investigation or inspection or any other state or federal agency having jurisdiction over such matters in connection with clean up or other efforts.

3.23 Beneficial Ownership Certification. As of the Closing Date, the information included in each Beneficial Ownership Certification is true and correct in all respects.

3.24 Subsidiaries and Affiliates. No Borrower (a) has any Subsidiary that is not a Borrower, (b) has any Affiliate that is not a Borrower that owns or operates any Permitted Concept, or (c) is engaged in any joint venture or partnership with any other Person.

## ARTICLE 4
## AFFIRMATIVE COVENANTS

Until such time as all Obligations are fully paid and performed:

4.1 Organization and Status; Preservation of Existence. Borrower will continue to be validly existing and in good standing under the laws of its state of incorporation or formation and will continue to be qualified to do business in the state where each Site is located.

4.2 Collateral. Borrower will (a) keep the Collateral free and clear of all Liens, other than the Permitted Exceptions; (b) use the Collateral only in its trade or business; (c) keep the tangible Collateral at each Site and maintain such tangible Collateral in good operating condition and repair and in material compliance with manufacturers' recommendations, normal wear and tear excepted; and (d) own and keep at each Site all equipment, including all machinery, furniture, appliances, trade fixtures, tools, office and record keeping equipment, and inventory required to be maintained by Borrower at such Site pursuant to the Franchise Agreement for such Site and that are reasonably necessary for the proper and prudent operation of such Site as the Permitted Concept.

4.3 Taxes. Borrower shall timely pay or cause to be paid, prior to delinquency, all Taxes which may at any time be assessed, levied or imposed upon Borrower, any Site, the Collateral, the Loan Documents, the Obligations, or the rents, issues, profits, damages, income and other benefits now or hereafter derived from any of the Sites, or which may arise in respect of the occupancy, use, possession or operation thereof.

4.4 Insurance.

(a) Insurance Requirements. Borrower shall obtain and keep in full force and effect insurance of the types and in amounts customarily carried in lines of business and in geographic areas similar to Borrower's and as Lender may specify from time to time in a letter or other written communication from Lender to Borrower referencing the Loan or this Section (each, an "***Insurance Requirements Letter***"), including (i) property insurance (Special Form) for 100% of full replacement value; (ii) business income insurance; (iii) builder's risk insurance, for any period during which construction shall take place on a Site; (iv) commercial general liability insurance, including excess/umbrella coverage and, if liquor, beer, or wine may be sold at or from the Site, liquor liability coverage; (v) worker's compensation insurance; (vi) flood insurance, for Mortgage Sites, as provided in the Mortgage; (vii) earthquake insurance, for Mortgage Sites located in an area designated by the US Geological Survey as high hazard; and (viii) such other policies and coverages as may be necessary to comply with Applicable Law or as Lender may otherwise require. Each required insurance policy and coverage (each, a "***Policy***") and each required binder, certificate, or other evidence of coverage (collectively, with the Policy, the "***Policy Documents***") shall satisfy the requirements set forth in this Section and in any Insurance Requirements Letter (collectively, the "***Insurance Requirements***"), unless, in a particular case, Lender, in its sole discretion and in writing, modifies or waives a particular Insurance Requirement. All Insurance Requirements are at the sole cost and expense of Borrower and apply to each Site. If, in addition to Borrower, any other Credit Party has an insurable interest in a particular Site, the Insurance Requirements shall apply with equal force to such other Credit Party, as if such Credit Party were a Borrower. Borrower's compliance or non-compliance with the Insurance Requirements shall not limit

Borrower's liability for the acts or omissions of Borrower or any other Credit Party as provided herein or in any of the other Loan Documents.

(b) Policy Requirements. Each insurer must be licensed to do business in each state where a Site is located and, except for NFIP approved flood insurance carriers, must be rated A-:VIII or better by Best's Key Rating Guide. Each Policy Document shall name Lender and its successors and/or assigns, and affiliates, as their interests may appear, as additional insureds and as mortgagee and loss payee, as applicable, and shall state Borrower's correct address and list Borrower as the named insured. Each Policy shall (i) provide that the Policy will not be terminated, cancelled or substantially modified without at least 30 days' prior written notice to Lender (10 days for non-payment) and be written for a period of at least 12 consecutive months; (ii) include a waiver of subrogation by the insurer as to claims against Lender, its employees, agents, and affiliates and provide that such Policy cannot be cancelled or suspended on account of the conduct of Borrower, its affiliates, or any of their respective officers, directors, employees, or agents; (iii) be written on an "occurrence" basis and provide that all coverage under such Policy is primary, that any "no other insurance" clause in such Policy excludes policies of insurance maintained by Lender or its affiliates, and that such Policy will not be brought into contribution with any insurance maintained by Lender or its affiliates; (iv) contain a standard without contribution mortgagee clause endorsement in favor of Lender, its successors, assigns, and affiliates, as their interests may appear; and (v) include an agreement by the insurer that any loss will be payable in accordance with the terms of the Policy notwithstanding any act or neglect of Borrower, anyone acting for Borrower, or any tenant or other occupant of a Site. At least 30 days prior to the expiration of each Policy, Borrower shall furnish Lender written evidence that such Policy has been renewed or replaced by delivering to Lender a copy of the replacement Policy or other documentation reasonably satisfactory to Lender evidencing that the required insurance is in full force and effect. Policy deductibles must be stated and may not exceed $10,000, unless otherwise provided herein or as Lender, in its sole discretion, may agree in writing.

(c) Lender Insurance. **SPECIAL NOTICE**: Unless Borrower provides Lender with evidence that the required Policies have been obtained, are in full force and effect, and meet the Insurance Requirements, Lender may purchase insurance at Borrower's expense to protect Lender's interests. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance satisfying the Insurance Requirements. Borrower shall reimburse Lender, upon demand, for the costs of such insurance obtained by Lender, together with interest thereon at the rate of 10% per annum from the date such insurance was purchased to the date of such reimbursement.

4.5 Casualty.

(a) Casualty; Continuation of Obligations. Borrower shall at all times bear the entire risk of any loss, theft, damage to, or destruction of, any Collateral from any cause whatsoever, including as a result of a taking by eminent domain (a "***Casualty***"). If a Casualty occurs, whether or not covered by insurance, Borrower will promptly give Lender written notice thereof, describing the nature and extent thereof. No Casualty shall relieve Borrower of any of its Obligations, including its obligation to make regularly scheduled Note payments.

(b) Restoration Obligation. Promptly following the occurrence of a Casualty, Borrower shall, at its expense, commence and diligently complete the repair, restoration, replacement, and rebuilding of the Collateral as nearly as possible to its value, condition and character immediately prior to the Casualty (a "***Restoration***"). Borrower shall not be excused from Borrower's Restoration obligation, regardless of whether there are Insurance Proceeds available to Borrower or whether any such Insurance Proceeds are sufficient in amount, and the application or release by Lender of any Insurance Proceeds shall not cure or waive any Default under this Agreement or the other Loan Documents or invalidate any act done pursuant thereto.

(c) Application of Insurance Proceeds. All insurance proceeds with respect to any Casualty (the "***Insurance Proceeds***") shall be payable to Lender, and Borrower authorizes and directs any affected insurance company to pay the Insurance Proceeds directly to Lender. If Borrower receives any Insurance Proceeds relating to such Casualty, Borrower shall promptly pay such proceeds to Lender. All Insurance Proceeds will be applied by Lender to payment of the Obligations in such order as Lender, in its sole

discretion, shall determine. To the extent that Insurance Proceeds are applied to prepay principal on the Loan, no prepayment fee will be charged in connection with such prepayment. Notwithstanding the foregoing, if no Default has occurred and is continuing, the Insurance Proceeds, less costs, fees and expenses incurred by Lender and Borrower in the collection thereof, including adjuster's fees and expenses and reasonable attorneys' fees and expenses (the "***Net Insurance Proceeds***"), shall be made available to Borrower as follows: (i) if the Net Insurance Proceeds are less than $25,000, the Net Insurance Proceeds shall be paid to Borrower and applied by Borrower to the cost of the Restoration; and (ii) if the Net Insurance Proceeds are $25,000 or greater, the Net Insurance Proceeds shall be held and disbursed by Lender, or as Lender may from time to time direct, as the Restoration progresses, to pay or reimburse Borrower for Restoration costs, upon Borrower's written request accompanied by evidence, reasonably satisfactory to Lender, that: (A) the Restoration is in compliance with Applicable Law and all private restrictions and requirements; (B) the amount requested has been paid or is then due and payable and is properly a part of such cost; (C) there are no Liens for labor or materials previously supplied in connection with the Restoration; (D) if the estimated cost of the Restoration exceeds the Net Insurance Proceeds (exclusive of proceeds received from Borrower's business income insurance), Borrower has deposited into an escrow satisfactory to Lender such excess amount, which sum will be disbursed pursuant to escrow instructions satisfactory to Lender; and (E) the balance of such Net Insurance Proceeds, together with the funds deposited into escrow, if any, will, after making the payment requested, be sufficient to pay the balance of the Restoration costs. Upon receipt by Lender of evidence reasonably satisfactory to it that the Restoration has been completed, the cost thereof has been paid in full, and that there are no Liens for labor or materials supplied in connection therewith, the balance, if any, of such Net Insurance Proceeds shall be paid to Borrower.

4.6 Obligations regarding Representations and Warranties. Borrower will do all things necessary or appropriate such that the representations and warranties of Borrower and the other Credit Parties contained in any of the Loan Documents remain true, complete, and correct.

4.7 Franchise Agreement. Borrower will timely comply with and perform all of its obligations under each Franchise Agreement, including all remodeling and re-imaging obligations, and will give Lender prompt written notice of the occurrence of any default by any Credit Party or Franchisor under such Franchise Agreement and of any notice of default given to any Credit Party by Franchisor. Borrower will send Lender copies of all notices given by a Credit Party to Franchisor concurrently with the giving of such notices to Franchisor. Borrower will keep each Franchise Agreement in full force and effect and will exercise all available options, such that the term of each Franchise Agreement, as so extended, will not expire prior to the Credit Facilities Maturity Date.

4.8 Lease Obligations. For each Leased Site, Borrower will timely comply with and perform all of lessee's obligations under each Lease, including any remodeling and re-imaging obligations, and will give Lender prompt written notice of the occurrence of any default by Borrower or Lessor and of any notice of default given to any Credit Party by Lessor. Borrower will also give Lender prompt written notice of any bankruptcy filing by or against Lessor of which Borrower has knowledge. Borrower will send Lender copies of all notices given by any Credit Party to Lessor concurrently with the giving of such notices to Lessor. Borrower will keep each Lease in full force and effect and will exercise all available options under the Lease, such that the term of the Lease, as extended, will not expire prior to the Credit Facilities Maturity Date. Upon Lender's request, Borrower shall use commercially reasonable efforts to obtain from Lessor (and any lender to Lessor), each in a form acceptable to Lender (a) landlord lien waivers and access rights; and (b) subordination, non-disturbance, and attornment agreements.

4.9 Requirement to Operate as Permitted Concept. Borrower shall at all times (a) occupy each Site and diligently operate its business at each Site as the Permitted Concept; ***provided however***, that Borrower may cease operations at a particular Site during the course of a Restoration, to the extent that operations cannot reasonably be conducted during such Restoration; and (b) maintain each Site, or use reasonable efforts to cause each Site to be maintained in accordance with the Lease, including all buildings and other improvements associated with the Site, in good condition and repair, ordinary wear and tear excepted and safe and properly lighted. Borrower will set aside and maintain adequate reserves for repair, replacement and maintenance of each Site in accordance with its obligations under the applicable Lease. Borrower shall not convert such Site or other Collateral to an alternative use while this Agreement is in effect, without Lender's consent, in Lender's sole discretion.

4.10 Compliance with Applicable Laws; Permits; Contractual Obligations. Borrower will comply with all Applicable Law, except for such non-compliance as could not reasonably be expected to have a Material Adverse Effect. Borrower will obtain and maintain in full force and effect at all times all permits that are required to use and operate each Site as a Permitted Concept, including any required liquor licenses. Borrower shall pay, perform and discharge all obligations, as and when do, all of its Contractual Obligations.

4.11 Payment of Indebtedness. Borrower will, and will cause each Credit Party to, pay and discharge, when due and prior to delinquency, all of its Indebtedness, including, within 60 days of incurrence, all trade debt.

4.12 Books and Records. Borrower will keep proper books and records in which complete and correct entries are made pursuant to GAAP and Applicable Law of all financial transactions and Borrower's assets and business.

4.13 Inspections. Each Credit Party shall, during normal business hours and upon reasonable advance written notice of at least seventy-two (72) hours (unless a Default shall have occurred and be continuing, in which case no notice shall be required and Lender shall have access at any and all times): (a) provide access to each Site to the Lender Parties and their representatives, as often as Lender reasonably deems appropriate; and (b) permit the Lender Parties and their representatives to inspect, audit and make copies (or take originals if reasonably necessary) of such Credit Party's books and records, and to inspect, review, evaluate and make physical inspections and appraisals of the Collateral in any manner and through any medium that Lender considers advisable, and, in each such case, each Credit Party agrees to provide Lender, at Borrower's cost and expense, such clerical and other assistance as Lender may reasonably request.

4.14 Anti-Money Laundering; Anti-Terrorism. Each Credit Party shall, at all times, comply, and cause its Affiliates to comply, with all AML Requirements. Neither Borrower nor any other Credit Party will use any proceeds of the Credit Facilities directly or indirectly for any payments to any government official or employee, political party, political party official, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the U.S. Foreign Corrupt Practices Act of 1977. Within five days of written request, Borrower shall provide Lender with such documentation as Lender may request from time to time, to verify compliance with the terms and conditions of this Section, including with respect to sources of funds for Payments made or to be made by any Credit Party.

4.15 Financial Reporting.

(a) Quarterly Reports for Borrower and each other Credit Party.

(i) Within 45 days after the end of each Fiscal Quarter of Borrower (including the last Fiscal Quarter in each Fiscal Year), Borrower shall deliver to Lender complete Financial Statements for the Fiscal Quarter then ended.

(ii) Within 45 days after the end of each Fiscal Quarter of Borrower (including the last Fiscal Quarter in each Fiscal Year), Borrower shall deliver to Lender bank and brokerage statements evidencing liquidity of Guarantor for the Fiscal Quarter then ended.

(b) Annual Reports for Borrower and each other Credit Party.

(i) Within 120 days after the end of each Fiscal Year of Borrower, Borrower shall deliver to Lender complete Financial Statements for Borrower for the Fiscal Year then ended.

(ii) Within 45 days after the end of each Fiscal Year of Borrower, Borrower shall deliver to Lender complete Financial Statements for Guarantor for the Fiscal Year then ended.

(c) Tax Returns. Within the earlier of (i) 30 days of filing such Tax Returns with the appropriate Government Authorities; or (ii) 120 days after the end of each Fiscal Year, Borrower shall deliver to Lender true and complete copies of all such Tax Returns filed by Guarantor.

(d) Intentionally Omitted.

(e) Other Information. Within 15 days following Lender's written request, Borrower will also deliver to Lender such additional Financial Statements and information (financial or otherwise) as Lender may reasonably request from time to time, to verify compliance with the terms and conditions of the Loan Documents, including with any financial covenants.

(f) Financial Statement Requirements. All Financial Statements shall be prepared in accordance with GAAP on a consistent basis from period to period. Quarterly Financial Statements may be company-prepared only; however, the annual Financial Statements shall have been (i) compiled by a certified public accounting firm reasonably acceptable to Lender any time prior to the date that Lender has disbursed at least $5,000,000 or more of Term Loan A and the DLOC Commitment Amount, and (ii) reviewed by a certified public accounting firm reasonably acceptable to Lender from and after the date that Lender has disbursed $5,000,000 or more of the aggregate of Term Loan A and the DLOC Commitment Amount. "***Financial Statements***" means, for Borrower and each Credit Party that is an entity, (i) a consolidated and consolidating balance sheet, including retained earnings, as of the end of the relevant fiscal period, together with related consolidating profit and loss statements, cash flows (if available), shareholders' equity, and all related schedules for the fiscal period then ended; and (ii) individual unit level profit and loss statements for the fiscal period quarter for all units operated by each Credit Party. In those cases where a Credit Party is an individual or a trust, Financial Statements shall mean statements of assets and liabilities, statements of trust property (if the Credit Party is a trust), tax returns, and such other information as Lender may reasonably request. "***Fiscal Quarter***" and "***Fiscal Year***" means, respectively, the quarterly accounting periods and the annual accounting periods of Borrower consistent with Borrower's accounting and reporting practices in effect on the Closing Date. Borrower's Fiscal Year ends December 31.

(g) Compliance Certificates. Each delivery of Financial Statements shall be accompanied by a compliance certificate from each Credit Party, in the form of ***Exhibit 4.15(g)*** (a "***Compliance Certificate***"), duly executed by the treasurer, chief financial officer, or other appropriate officer of such Credit Party.

4.16 Financial Covenants. Borrower shall comply with each of the following financial covenants:

(a) New Store Post-Compensation Consolidated FCCR. As measured for each New Store on the last day of each of Borrower's Fiscal Quarters commencing with the first full Fiscal Quarter after the New Store Opening Date for such New Store and for each Fiscal Quarter thereafter through and including the third full Fiscal Quarter after the New Store Opening Date (with respect to such New Store, each a "***New Store Calculation Date***"), such New Store must have a New Store Post-Compensation Consolidated FCCR equal to or greater than 1.15:1. "***New Store***" shall mean a Site that has been permanently open for operations as a Permitted Concept for at least 1 month but less than 12 months as of the applicable New Store Calculation Date. "***New Store Opening Date***" shall mean, with respect to each New Store, the date such New Store permanently opens for operations as a Permitted Concept.

In the event the New Store Post-Compensation Consolidated FCCR for a New Store is less than 1.15:1 as of any New Store Calculation Date, Borrower shall repay the outstanding DLOC Draws attributable to such New Store in an amount sufficient to cause the New Store Post-Compensation Consolidated FCCR to be at least equal to 1.15:1 (the "***New Store Prepayment Amount***"), calculated on a pro forma basis taking into

consideration the amount of such prepayment. The New Store Prepayment Amount shall be calculated and determined by Lender in its sole and absolute discretion.

(b) Mature Stores Post-Compensation Consolidated FCCR. As measured for Borrower and its consolidated Subsidiaries on the last day of each of Borrower's Fiscal Quarters, commencing with the first Fiscal Quarter during which at least one Site constitutes a Mature Store and for each Fiscal Quarter thereafter, Borrower and its consolidated Subsidiaries must have a Mature Stores Post-Compensation Consolidated FCCR equal to or greater than 1.15:1. "***Mature Stores***" shall mean each Site that has permanently opened for operations that is not a New Store.

(c) Liquidity Requirement. As measured for Guarantor and Borrower on the last day of each Fiscal Quarter, commencing with the third Fiscal Quarter of 2024 and for each Fiscal Quarter thereafter, Guarantor and Borrower must maintain in the aggregate Liquid Assets at least equal to $1,500,000.00. "***Liquid Assets***" shall mean (i) with respect to Guarantor, cash, cash equivalents and/or publicly traded/quoted marketable securities reasonably acceptable to Lender, held in account(s) maintained with financial institution(s) or brokerage firm(s) reasonably acceptable to Lender, and (ii) with respect to Borrower, cash held in account(s) maintained with Lender. Each Compliance Certificate delivered by Borrower pursuant to ***Section 4.15(g)*** of this Agreement shall set forth the amount of Liquid Assets of Guarantor and Borrower, and Borrower shall deliver to Lender, together with each Compliance Certificate, all such statements and materials evidencing such compliance.

4.17 Notice of Litigation and Other Defaults. Borrower will give prompt written notice to Lender of the following of which Borrower has knowledge: (a) any lawsuit or proceeding instituted by or against it in any court or before any arbitrator, commission or regulatory body or any such proceeding which is threatened against it; (b) any other action, event or condition of any nature which could reasonably be expected to have a Material Adverse Effect, or which, with notice or lapse of time or both, would constitute an event of default or a default under any other instrument or agreement to which it is a party or by or to which it or any of its assets may be bound or subject; and (c) the occurrence of any Default and the action Borrower proposes to take with respect thereto.

4.18 Estoppel Certificates. From time to time and within 15 days after a request from Lender, Borrower will execute and deliver to Lender a certificate, in the form supplied by Lender, certifying (a) the unpaid principal of and interest on the Note as of the date of the certificate and whether Borrower or any other Credit Party claims any offset or defense against any such amounts; (b) whether, to the best of Borrower's knowledge, there are then any existing Defaults by Borrower in the performance of its Obligations under any of the Loan Documents, and, if there are any such Defaults, specifying the nature and extent thereof; and (c) as to such other facts and circumstances as Lender may reasonably request.

4.19 Further Assurances.

(a) Each Credit Party shall ensure that all written information, exhibits and reports furnished to Lender do not and will not contain any untrue statement of a material fact and do not and will not omit to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and will promptly disclose to Lender and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof.

(b) Promptly upon request by Lender, the Credit Parties shall (and, subject to the limitations hereinafter set forth, shall cause each of their Subsidiaries to) take such additional actions and execute such documents as Lender may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement or any other Loan Document, (ii) to subject to the Liens created by any of the Loan Documents any of the assets of Borrower and the rights or interests covered by any of the Loan Documents, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Loan Documents and the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Lender the rights granted or now or hereafter intended to be granted to Lender under any Loan Document; provided, that each Credit Party shall not be required to execute and deliver the same (nor shall Lender sign under any power of attorney) which increase a Credit Party's obligations and/or

liabilities under the Loan Documents (other than in de minimis respects) or decrease a Credit Party's rights under the Loan Documents (other than in de minimis respects) and such documents and instruments shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in such documents and instruments will be given by Borrower only as of the Closing Date.

(c) Without limiting the generality of the foregoing and except as otherwise approved in writing by Lender, the Credit Parties shall cause each of their Subsidiaries (which is not already a Credit Party), whether now existing or hereafter created or acquired, to join in this Agreement and the other Loan Documents as a "Borrower" and to assume and be liable for, jointly and severally with each other Borrower, the Obligations and to cause each such Subsidiary to grant to Lender a security interest in, subject to the limitations hereinafter set forth, all of such Subsidiary's assets to secure the Obligations. If any Credit Party or any subsidiary of any Credit Party acquires an Acquisition Parcel, each Acquisition Parcel, upon acquisition shall be deemed a "Site" and part of the Collateral, subject to all terms, conditions, and requirements in the Loan Documents applicable to Sites and Collateral. If such Acquisition Parcel is subject to a Lease, the Acquisition Parcel shall also be deemed a "Leased Site" for all purposes. For any fee interest in any Acquisition Parcel or any leasehold interest in any Acquisition Parcel, to the extent that Lender determines the value of such leasehold interest is material, simultaneously with such acquisition, Borrower shall satisfy, or cause to be satisfied, such further real estate requirements as Lender deems necessary in its sole discretion.

4.20 Cross-Collateralization. In addition to securing payment and performance of the Obligations with respect to the Credit Facilities and Loan Documents, **THE PARTIES INTEND AND AGREE THAT THE COLLATERAL ALSO SECURES PAYMENT AND PERFORMANCE BY EACH RELATED AGREEMENT OBLIGOR OF ITS RESPECTIVE OBLIGATIONS UNDER THE RELATED AGREEMENTS TO WHICH IT IS A PARTY**, all for the benefit of Lender and any other holder or owner of the Obligations under the Related Agreements. Borrower understands and agrees that the provisions in this Section are an express bargained-for element of the transactions contemplated by this Agreement and that Lender would not have entered into this Agreement or made the Credit Facilities available to Borrower without these provisions being included.

4.21 Principal Depository Bank and Cash Management. Borrower will maintain Lender as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity, and other deposit accounts for the conduct of Borrower's business (the ***"Principal Deposit Accounts***"). If required by Lender, Borrower shall at all times subject the Principal Deposit Accounts to control agreements in form and substance acceptable to Lender.

4.22 Beneficial Ownership Certification.

(a) Promptly following the addition of any New Entity as a co-Borrower under the Loan Documents, Borrower shall provide Lender with all information and documentation with respect to such New Entity reasonably requested by the Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws, including, if such New Entity is a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to such New Entity.

(b) In the event of any material change in the information provided to Lender in connection with Lender's compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws, Borrower shall provide Lender such updated documentation and information necessary to maintain such compliance with respect to each co-Borrower, including, if such co-Borrower is a "legal entity customer" under the Beneficial Ownership Regulation, a new Beneficial Ownership Certification for such co-Borrower, prior to or within 10 days after any such change.

4.23 Account Collateral. Borrower has granted Lender a first priority security interest in the Account Collateral as additional security for the Obligations, together with all rights of a secured party with respect thereto, and authorized Lender to file any financing statement or statements required by Lender to establish or maintain the

validity, perfection and priority of the security interest granted herein in connection with the Account Collateral. Notwithstanding any other provision of the Loan Documents, during any period that an Event of Default exists, the Account Collateral may be held, drawn on, disbursed, and applied to the items for which such sums or collateral were established or to payment of the Obligations in accordance with and pursuant to ***Section 1.6(c)***. Lender's right to withdraw and apply such funds after the occurrence and continuation of an Event of Default shall be in addition to all other rights and remedies provided to it under the Loan Documents.

## ARTICLE 5
## NEGATIVE COVENANTS

Until such time as all Obligations are fully paid and performed:

5.1 No Name or Other Organizational Changes. No entity Credit Party shall (a) amend, restate, supplement, or terminate its organizational documents in a manner that could reasonably be expected to have a Material Adverse Effect; or (b) change any of the following from what it is as of the Closing: (i) its name; (ii) its place of business or, if there is more than one principal place of business, its chief executive office; (iii) its mailing address; (iv) the location of its books and records; (v) the type of legal entity that it is; (vi) the organization identification number issued by its state of incorporation or organization, if it has one; however if such Credit Party does not have such a number and later obtains one, such Credit Party will immediately notify Lender of such number; or (vii) its state of incorporation or organization, without, in each instance, giving Lender at least 45 days' prior written notice thereof and taking all actions deemed necessary or appropriate by Lender to continuously protect and perfect Lender's Liens in the Collateral.

5.2 Accounting Changes. No Credit Party shall change its accounting treatment, or reporting practices, except as required by GAAP or Applicable Law and then only after giving effect to ***Section 8.23*** or change its Fiscal Year from that in effect on the date hereof.

5.3 Maintenance of Existence; Consolidations and Mergers. No entity Credit Party shall dissolve, liquidate, or otherwise cease to exist or merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person; ***provided, however***, that the foregoing shall not operate to prevent a transaction that results in the Obligations being paid and performed in full.

5.4 Business and Operational Changes. No Credit Party shall (a) make any changes in any of such Credit Party's business objectives, purposes, or operations that could reasonably be expected to adversely affect repayment of the Obligations or that could reasonably be expected to have a Material Adverse Effect; (b) carry on any business, operations or activities substantially different from those carried on by such Credit Party at the date hereof, including business, operations and activities reasonably related thereto; or (c) by itself or through any sale, lease or other transfer, convert any Site or other Collateral to an alternative use.

5.5 No Liens. No Credit Party shall incur, maintain or otherwise suffer to exist any Lien upon or with respect to any Collateral, except for Permitted Exceptions.

5.6 Franchise Agreement Changes. No Credit Party shall: (a) agree to any Franchise Agreement amendment that could reasonably be expected to materially and adversely affect (i) the rights and privileges of the franchisee thereunder; or (ii) the rights, privileges, and remedies of Lender under the Loan Documents with respect to the Collateral or the Franchise Agreement; or (b) assign, transfer, mortgage, pledge or otherwise encumber any Franchise Agreement or any interest therein to any Person other than Lender. Borrower will send Lender a copy of all Franchise Agreement amendments promptly following execution thereof by all parties thereto.

5.7 Lease Changes. With respect to each Leased Site, no Credit Party shall: (a) agree to a Lease amendment that could reasonably be expected to materially and adversely affect (i) the rights and privileges of the lessee thereunder; or (ii) the rights, privileges, and remedies of Lender under the Loan Documents, with respect to the Collateral or the Lease; (b) enter into any sublease with respect to any Site, except for subleases to another Borrower; or (c) assign, transfer, mortgage, pledge or otherwise encumber any Lease or any interest therein to any Person other

than Lender. Borrower will send Lender a copy of all Lease amendments promptly following execution thereof by all parties thereto.

5.8 Prohibited Transactions. No Credit Party shall do or permit to be done, voluntarily or involuntarily, or by operation of law or otherwise, any of the following (each, a "***Prohibited Transaction***") without the prior written consent of Lender, in its sole discretion: (a) sell, lease, mortgage, pledge, license, assign, transfer, or otherwise encumber or dispose of any Collateral to any Person, except for (i) sales of inventory in the ordinary course of business; and (ii) so long as no Default has occurred and is continuing, sales or other dispositions of obsolete equipment consistent with past practices, so long as such items are replaced by items of equal or greater value and utility; (b) sell, mortgage, pledge, assign, transfer, or otherwise encumber or dispose of its interest in this Agreement or the other Loan Documents; (c) engage in or allow a change of Control of any Credit Party to occur, including a change resulting from (i) direct or indirect transfers of beneficial ownership of, or the right and power to vote, stock or partnership, membership or other ownership interests, whether in one or a series of transactions; or (ii) creation or issuance of new or additional equity interests; (d) pledge, assign, or otherwise encumber or dispose of any interest in any Credit Party as collateral for any obligation of a Credit Party or any other Person; or (e) enter into any agreement to do, or which would or could result in, any of the foregoing.

5.9 Affiliate Transactions; Use of Funds. Except for intra corporate transactions between Credit Parties but otherwise subject to the terms and conditions of this Agreement, no Credit Party shall enter into a transaction between such Credit Party and any Affiliate of any Credit Party unless the transaction is on terms substantially as advantageous as those which could be obtained in a comparable arm's length transaction with an independent third party. Borrower shall not use any proceeds of the Credit Facilities or the Collateral for personal, family, or household purposes.

5.10 Equity Distributions. Prior to such time that Borrower owns at least one Mature Store and has complied with the Mature Stores Post-Compensation Consolidated FCCR covenant under Section 4.16 for at least one Fiscal Quarter, Borrower shall not make any dividends or distributions, except that, so long as no Default or Event of Default has occurred and is continuing, Borrower may make Permitted Tax Distributions. Thereafter, Borrower shall not make any dividend or distribution for or on account of equity interests in Borrower if, either before or after giving effect to such dividend or distribution, a Default or Event of Default would occur or has occurred and is continuing.

5.11 ERISA. Borrower shall not establish, maintain or incur any Liabilities with respect to, any ERISA employee benefit plan or multiemployer plan.

5.12 No Further Indebtedness. Borrower shall not create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, other than the Obligations and trade indebtedness incurred in the ordinary course of business.

5.13 Restrictions on the Prepayment of Indebtedness. Borrower shall not: (a) prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof any Indebtedness, other than Indebtedness in favor of a Lender Party; (b) set apart any property for such purpose, whether directly or indirectly and whether to a sinking fund or otherwise; or (c) make any payment in violation of any subordination agreement relating to any Indebtedness; ***provided, however***, that Borrower may, to the extent otherwise permitted by the Loan Documents, (x) prepay the Obligations; and (y) make regularly scheduled or otherwise required repayments or redemptions of Indebtedness existing on the date hereof, but only, in the case of subordinated debt, to the extent permitted by the subordination agreement relating thereto.

5.14 Management Agreements. No Borrower shall enter into any management agreement or amend, modify or terminate any management agreement, or incur any management fees.

## ARTICLE 6
## DEFAULTS AND REMEDIES

6.1 Defaults. The following constitute events of default (each, an "***Event of Default***"):

(a) Monetary Default. If any Obligation for the payment of money is not paid (i) in the case of any scheduled monthly payments due under the Notes or any other regularly scheduled payments under the Loan Documents, within 10 days of the due date therefor (the "***Outside Payment Date***") (provided, however, on a one-time basis during any twelve (12) month period, the failure of Borrower to timely pay a scheduled payment by the Outside Payment Date shall not constitute an Event of Default if paid by Borrower within five (5) days of written notice from Lender to Borrower), (ii) in the case of payments due on the Credit Facilities Maturity Date, on the Credit Facilities Maturity Date, and (iii) in the case of any other payments if no specific due date is specified, then within 10 days of written demand from Lender.

(b) Misrepresentations. If (i) any representation or warranty of any Credit Party contained in any of the Loan Documents was untrue or incorrect in any material respect when made or deemed made, or (ii) if a Credit Party renders any statement or account which is untrue, incorrect, or incomplete in any material respect (each, a "***Misrepresentation***"), unless such Misrepresentation (A) was not knowingly or intentionally made, (B) is capable of being cured (i.e., the facts and circumstances underlying the applicable Misrepresentation can be changed such that the applicable representation as made or delivered will be true and accurate), and (C) is so cured within five (5) business days after the earlier of (1) the date on which Borrower first has knowledge that such Misrepresentation exists, and (2) the date on which Lender first notifies Borrower in writing that such Misrepresentation exists.

(c) Certain Covenant Breaches. If Borrower (i) shall fail to maintain insurance in accordance with the requirements of this Agreement or any of the other Loan Documents; (ii) is not in compliance with any financial covenant contained in ***Article 4***; or (iii) breaches any of the covenants contained in ***Article 5***. An Event of Default under ***clause (ii)*** or ***clause (iii)*** shall conclusively be deemed to be a continuing Event of Default until Lender, in its sole discretion, waives such Event of Default in writing.

(d) Non-Monetary Events of Default. If any Credit Party fails to observe or perform any of the covenants, conditions, or obligations of this Agreement or any of the other Loan Documents, other than those referred to in the other subsections of this ***Section 6.1***, and such failure continues without being fully cured for more than 30 days following written notice to such Credit Party of such failure. However, if such failure is not willful or intentional, does not place any rights or interest in any Collateral in immediate jeopardy, and is within the reasonable power of such Credit Party to promptly cure after receipt of notice thereof, all as determined by Lender in its reasonable discretion, then such failure shall not constitute an Event of Default (unless otherwise expressly provided) if during such 30-day period, such Credit Party begins to cure the failure and then diligently pursues the cure to completion, except that in no event will the cure period under this subsection exceed 90 days from the date such Credit Party receives the notice from Lender. If such Credit Party fails to cure such failure within the time periods provided in this subsection, an Event of Default shall be deemed to have occurred without further notice or demand of any kind being required.

(e) Dissolution or Division. Any Credit Party that is an entity is dissolved, is the subject of a division or its existence is terminated or there is commenced against any such Credit Party any action or proceeding which seeks as one of its remedies the dissolution of such Credit Party or termination of its existence.

(f) Bankruptcy, Insolvency, and Certain Other Proceedings. Occurrence of any of the following:

(i) Insolvency; Business Cessation. Any Credit Party (A) ceases to be Solvent; (B) generally fails to pay, or admits in writing its inability to pay, its debts as they become due, subject to applicable grace periods, if any, whether at stated maturity or otherwise; (C) voluntarily ceases to conduct its business in the ordinary course; or (D) takes any action to effectuate or authorize any of the foregoing;

(ii) Insolvency Proceedings. Any Credit Party shall institute or have instituted against it any proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, receivership, or relief of debtors, (A) seeking to adjudicate it bankrupt or insolvent; (B) seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, composition of it or its debts or any similar order; or (C) seeking entry of an order for relief or appointment of a custodian, receiver, trustee, conservator, liquidating agent, liquidator, or other official with similar powers, for it or for any substantial part of its property; and in the case of any such proceeding or other action instituted against (but not by or with the consent of) such Credit Party, either (y) such proceeding or action shall remain undismissed or unstayed for a period of 60 days or more; or (z) any action sought in such proceedings shall occur;

(iii) Failure of Enforceability or Lien. If (A) any provision of any Loan Document shall, at any time after the delivery of such Loan Document, fail to be valid and binding on, or enforceable against, a Credit Party; (B) any Loan Document purporting to grant a Lien to secure any Obligation shall, at any time after the delivery thereof, fail to create a valid and enforceable Lien on any Collateral purported to be covered thereby; (C) any such Lien shall fail or cease to be a perfected Lien with the priority required in the relevant Loan Document; or (D) a Credit Party shall state in writing that any of the events described in the preceding clauses of this subsection has occurred; or

(iv) Actions in Furtherance. Any Credit Party shall take any action to authorize or effectuate, or otherwise further, any action or circumstance described in the preceding clauses of this ***Section 6.1(f)***.

(g) Litigation. A final judgment or judgments for the payment of money shall be rendered against any Credit Party, unless (i) the same shall be (A) fully covered by insurance and the issuer(s) of the applicable policies shall have acknowledged full coverage in writing within 30 days of judgment or (B) vacated, stayed, bonded, paid or discharged within a period of 45 days from the date of such judgment; or (ii) payment of such money judgment would not have a Material Adverse Effect.

(h) Death or Incompetency of Guarantor. A Guarantor dies or becomes incompetent; ***provided, however***, that in the event of a death or incompetency, an Event of Default shall not occur if either (i) such Guarantor’s estate or conservator, as applicable, assumes unconditionally the obligations arising under the Guaranty in a manner satisfactory to Lender, and Lender determines in its reasonable discretion that such deceased Guarantor's estate or Guarantor, through Guarantor's conservator, as applicable, maintains a tangible net worth and liquidity that is not less than the tangible net worth and liquidity of the applicable Guarantor at such Guarantor's death or incompetency, or (ii) a substitute Guarantor acceptable to Lender, in Lender's sole and absolute discretion, is provided within 30 days of such death or incompetence.

(i) Other Defaults. If (i) there is a default with respect to any Related Agreement that is not cured within any applicable notice or cure period; (ii) a default occurs in the payment or performance when due (after giving effect to any applicable notice and grace periods), whether by acceleration or otherwise, of any Indebtedness or other material Contractual Obligation of any Credit Party; (iii) any Franchise Agreement or Lease terminates or expires prior to the performance and payment in full of the Credit Facilities; or (iv) any other event or circumstance designated elsewhere in this Agreement or the other Loan Documents as an Event of Default shall occur.

(j) Crimes and Forfeitures. Any officer, director, manager, or owner of a Credit Party shall be charged with, indicted for, or convicted of a crime (other than misdemeanor traffic violations), a punishment for which could include the forfeiture of any assets of such Credit Party or of any equity interest in such Credit Party, the loss of eligibility for any permit, imprisonment, or a material fine or other material monetary penalty.

6.2 Remedies. Upon the occurrence and during the continuance of an Event of Default, Lender may (a) terminate or suspend (at Lender’s sole option) the obligation to fund Draws; and/or (b) declare all or any part of the Obligations to be due and payable without presentment, demand, protest or further notice of any kind. Upon any

Event of Default described in ***Section 6.1(f)***, the obligation to fund Draws shall automatically terminate and all of the Obligations shall be immediately due and payable. Borrower waives any notice of intent to accelerate the Obligations and notice of acceleration. In addition to terminating or suspending Draws and declaring the Obligations due and payable, Lender may exercise, at its option, concurrently, successively or in any combination, all rights and remedies now or in the future available under any of the Loan Documents or at law or in equity, and none of such rights or remedies are exclusive. In addition to any remedies set forth in the Loan Documents, Lender shall have the right to setoff and apply any amounts held in any deposit accounts of Borrower held with Lender or an Affiliate of Lender against the Obligations. Neither the acceptance of this Agreement nor its enforcement shall prejudice or in any manner affect Lender's rights to realize upon or enforce its rights with respect to any security now or in the future held by Lender, and Lender is entitled to enforce this Agreement and its rights and remedies with respect to any such security in such order and manner as it may in its sole discretion determine.

6.3 No Waiver or Cure. Neither the application of a default rate of interest in the circumstances described in the Notes or any of the other Loan Documents nor the imposition of any late fee shall be interpreted to extend any cure period set forth in any Note or any other Loan Document; to cure any Default; or to otherwise limit or waive any of Lender's rights or remedies under this Agreement, the Notes, or any other Loan Document.

6.4 Full Payment Required. The acceptance by Lender of any sum after the same is due shall not constitute a waiver of the right either to require prompt payment, when due, of all other sums hereby secured or to declare a subsequent Event of Default. The acceptance by Lender of any sum in an amount less than the sum then due shall be deemed to be an acceptance on account only and upon condition that it shall not constitute a waiver of Borrower's obligation to pay the entire sum then due, and Borrower's failure to pay such entire sum then due shall, at Lender's election, constitute an immediate Event of Default without the necessity for any further notice, notwithstanding such acceptance of such amount on account.

6.5 Right to Cure; Interest; Late Fees. Lender may (but has no obligation to) pay, perform, and discharge any and all costs, expenses and liabilities that are the responsibility of any Credit Party under any Loan Document, if such Credit Party fails to timely pay, perform or discharge the same after 10 days prior written notice to such Credit Party of Lender's intent to take such action. All amounts reasonably expended by Lender in so doing shall (a) be part of the Obligations, secured by Lender's Liens; (b) bear interest at the rate of 10% per annum from the date Lender made payment until paid; and (c) be immediately due and payable to Lender on demand. All other amounts at any time owed by any Credit Party to Lender, other than amounts due and payable pursuant to the Note, shall bear interest at the rate of 10% per annum from the date due until paid. Late fees shall be due and payable as provided in the Note.

## ARTICLE 7
## LENDER TRANSFERS

7.1 Lender Transfers. Lender, from time to time and without the consent of any Credit Party, may assign, sell, or transfer all or any portion of its right, title, and interest, including servicing rights, in the Credit Facilities, the Loan Documents; or any Loan, in each case whether as part of a securitization or by participation, assignment, sale or other transfer (each, a "***Lender Transfer***," with the interests that are the subject of the Lender Transfer being referred to as the "***Transferred Interests***"). From and after the date of a Lender Transfer, Lender shall automatically be released from liability for the performance of any obligation arising out of or relating to the Transferred Interests. Each Credit Party shall execute such modifications to the Loan Documents or other documents as shall, in Lender's reasonable judgment, be necessary or desirable in connection with any Lender Transfer. Upon a Lender Transfer (including transfer of a participation interest) of less than all of the Credit Facilities (a "***Partial Assignment***"), each Credit Party agrees that: (a) Lender may become a fiscal agent, administrative agent, or servicer of the Credit Facilities or may delegate servicing or agent responsibilities to another Person; (b) the granting of consents or approvals pursuant to the Loan Documents may require the compliance with participation agreements, servicing agreements, co-lending agreements or other agreements governing the Partial Assignment, including the joinder or agreement of other Persons holding an interest pursuant to the Partial Assignment or providing servicing with respect to the Credit Facilities; and (c) Lender will not be in breach or violation of this Agreement or the other Loan Documents or be deemed to have acted unreasonably after a Partial Assignment if Lender withholds a consent or approval by reason of Lender's inability to obtain the required joinder or agreement of such other Persons.

## ARTICLE 8
## GENERAL PROVISIONS

8.1 Defined Terms; Applicability of General Provisions. Capitalized terms used herein and in the other Loan Documents and not otherwise defined herein or therein have the meanings set forth on the "***Schedule of Defined Terms***" attached as ***Exhibit 8.1***. The Schedule of Defined Terms also includes various rules of construction and interpretation that the parties agree are applicable to each Loan Document. Unless otherwise specifically provided, all terms defined herein, on the Schedule of Defined Terms, or in any other Loan Document shall have the same defined meanings when used in any certificate or other document made or delivered pursuant hereto or thereto. Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein provided. The provisions of this Article and the Schedule of Defined Terms apply equally to each Loan Document and each Credit Party, the same as if such provisions were set forth in full in each other Loan Document

8.2 Modifications, Approvals, Waivers and Consents. None of the terms and provisions of this Agreement or the other Loan Documents may be amended, extended, renewed, terminated, or supplemented, nor shall Lender have waived any of its rights under any of the Loan Documents, by any course of dealing or other action or inaction of the parties, unless and until the Credit Parties obtain Lender's prior written consent with respect to any such matter, which consent may be withheld or conditioned in Lender's sole discretion, unless otherwise expressly provided in the Loan Documents. Lender's approval or waiver of, or consent to, any matter shall not be deemed an approval or waiver of, or consent to, the same or any other matter on any future occasion. All approvals, waivers, and consents granted by Lender for any matter shall be narrowly construed to cover only the parties and facts identified in such approval, waiver or consent. No failure to exercise and no delay in exercising, on Lender's part, any right, remedy, power or privilege hereunder or pursuant to any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or pursuant to any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

8.3 Binding Effect. Each of the Loan Documents shall become effective when executed by the required Credit Parties and Lender and shall be binding upon and inure to the benefit of the Credit Parties and Lender, and, in each case, their respective heirs, executors, representatives, successors and permitted assigns.

8.4 Costs, Expenses and Fees. Any action taken by a Credit Party with respect to the Loan or any Loan Document, even if required thereunder or at Lender's request, shall be at Borrower's sole cost and expense. Borrower agrees to pay Lender, or reimburse Lender within 10 days of written demand therefor, for all reasonable out-of-pocket costs and expenses, including reasonable attorneys' fees and expenses, incurred by or on behalf of the Lender Parties in connection with: (a) the interpretation or administration of the Loan and Loan Documents, including Lender's evaluation of, and determinations with respect to, any conditions precedent that must, at any time, be satisfied by Borrower; (b) the preparation, negotiation, execution, and consummation of any modification, termination, or waiver of any Loan Document, including any commitment or proposal letter related thereto; (c) any request for Lender consent to or approval of any matter; (d) internal audit reviews, field inspections, Collateral examinations, and Collateral releases and substitutions; (e) any refinancing or restructuring of the Loan in the nature of a "work-out"; (f) the enforcement or preservation of any right or remedy under any Loan Document or with respect to any Obligation or the Collateral, or any other related right or remedy, whether at law or in equity; (g) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Loan Document, any Collateral, or any Obligation (including preparation for and/or response to any subpoena or request for document production relating thereto); and (h) any other matter stated herein or in any other Loan Documents to be at the expense of Borrower or any other Credit Party. Lender may charge, and Borrower agrees to pay, a reasonable processing and review fee in connection with the foregoing matters. Lender may also charge Borrower such additional fees as Lender may require, as consideration to Lender in connection with, and as a condition precedent to, any such matter. From time to time, Lender may impose fees or charges, which Borrower agrees to pay, for returned checks, multiple payoff quotes, additional document copies, processing non-ACH payments, release fees, and such other services as it may provide to any Credit Party during the term of the Loan.

8.5 Broker Involvement. Except for JG Franchise Consulting, LLC, Borrower represents and warrants to and covenants with Lender that no Credit Party has dealt with any broker, agent, finder or other intermediary, and Lender represents and warrants to and covenants with Borrower that no Lender Party has dealt with any broker, agent,

finder or other intermediary, in each case in connection with the Loan and the transactions contemplated by this Agreement and the other Loan Documents.

8.6 Indemnities. Borrower agrees to indemnify, hold harmless and defend each of the Lender Parties (each, an "***Indemnitee***") for, from and against all Liabilities that may be imposed on, incurred by or asserted against an Indemnitee in any matter relating to or arising out of: (a) any Loan Document or Obligation (or repayment thereof) or the use of Loan proceeds; (b) any commitment letter, proposal, or term sheet with any Person; (c) Borrower's operations at or relating to the Sites; (d) the Collateral, including its design, construction, operation, alteration, maintenance, or use by Borrower or any other Person; (e) any permitted disclosure of Credit Party Information; (f) any misrepresentation or inaccuracy in any representation or warranty in any Loan Document; (g) any breach or failure by any Credit Party to pay or perform the Obligations; or (h) any other act, event or transaction related, contemplated in or attendant to any of the foregoing, including any actual or prospective investigation, litigation or other proceeding relating to any of the foregoing, whether or not such Indemnitee initiated such investigation, litigation or other proceeding or is a party thereto and without regard to legal theory, including pursuant to Applicable Law, common law, equity, contract, tort, or otherwise (collectively, the "***Indemnified Matters***"). Notwithstanding the foregoing, Borrower shall not have any liability hereunder to any Indemnitee with respect to any Indemnified Matter, to the extent such liability has resulted primarily from the gross negligence or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Furthermore, Borrower and each other Credit Party waive and agree not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Lender Party.

8.7 Survival. Any indemnification or other protection provided to a Lender Party pursuant to any Loan Document, all representations and warranties made in any Loan Document, the provisions of this ***Article 8***, and all other provisions of the Loan Documents that are stated to survive, shall survive repayment in full and performance of the Obligations and inure to the benefit of any Person that at any time held a right thereunder and, thereafter, its successors and permitted assigns.

8.8 Limitation of Liability. In no event shall Lender, any Credit Party, or any Affiliate of Lender or any Credit Party be liable to any Person on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings). Lender and each Credit Party hereby waive, release and agree (and shall cause each of its respective Affiliates to waive, release and agree) not to sue upon any claim for special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor; ***provided, however***, that nothing herein shall be deemed a waiver of Lender's rights to sue upon or otherwise recover on all amounts due Lender under the Loan Documents, including with respect to the Obligations and the Collateral.

8.9 Relationship of the Parties. The relationship between Lender, on the one hand, and the Credit Parties, on the other hand, is solely that of lender and debtor. Lender has no fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between Lender and any Credit Party by virtue of, any Loan Document or any transaction contemplated therein. No Loan Document provision is intended, nor shall be deemed or construed, to make Lender in any way responsible for the debts, obligations or losses of any Credit Party.

8.10 Notices. All notices, demands, requests, and other communications (collectively, "***Notices***") required or authorized to be made by the Loan Documents shall be in writing and addressed (a) if to Borrower, to Borrower's notice address on the signature page hereto or to such other address as Borrower may provide to Lender in a Notice given after the date hereof with copy to Borrower's counsel, Albert M. Belmont, III, Bochetto & Lentz,P.C., 1524 Locust Street, Philadelphia, PA 19102; (b) if to any other Credit Party, to the notice address for such Credit Party specified in the Loan Documents executed by such Credit Party or to such other address as such Credit Party may provide to Lender in a Notice given after the date hereof; and (c) if to Lender, at Lender's notice address on the signature page hereto or to such other address as Lender may provide to the Credit Parties in a Notice given after the date hereof. Notices may be given by hand delivery; by overnight delivery service, freight prepaid; or by U.S. mail, postage paid, and shall be effective and deemed to have been received (x) upon personal delivery to a responsible individual at the appropriate notice address, if Notice is given by hand delivery; (y) one Business Day

after delivery to an overnight delivery service, if Notice is given by overnight delivery service; and (z) two Business Days following deposit in the U.S. mail, if Notice is given by U.S. mail.

8.11 Governing Law. **THE LAWS OF THE STATE OF COLORADO (WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAWS PRINCIPLES) SHALL GOVERN ALL MATTERS ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, INCLUDING ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT**.

8.12 Jurisdiction and Service of Process. Any legal action or proceeding with respect to any Loan Document shall be brought exclusively in the courts of the State of Colorado located in Arapahoe County or of the United States for the District of Colorado, sitting in Denver, Colorado, and each Credit Party unconditionally accepts, for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; ***provided, however***, that nothing in this Agreement shall limit or restrict Lender's right to commence any proceeding in the federal or state courts located in the state in which a particular Site is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under any Loan Document. Lender and each Credit Party irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions. Each Credit Party irrevocably waives personal service of any and all legal process, summons, notices and other documents of any kind and consents to such service in any suit, action or proceeding brought in the United States by any means permitted by Applicable Law, including by the mailing thereof to such Credit Party (by registered or certified mail, postage prepaid) to such Credit Party's notice address, determined as provided in ***Section 8.10*** (and shall be effective when such mailing shall be effective as provided in ***Section 8.10***. Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

8.13 Waiver of Jury Trial. **LENDER AND EACH CREDIT PARTY, TO THE MAXIMUM EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE**.

8.14 Severability. Any provision of any Loan Document being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held illegal, invalid or unenforceable, any other provision of any Loan Document or any part of such provision in any other jurisdiction.

8.15 Document Execution. This Agreement and the other Loan Documents may be executed in any number of counterparts and by different parties in separate counterparts, each of which, when so executed, shall be deemed an original and all of which, taken together, shall constitute one integrated agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Except as otherwise expressly provided in any Loan Document, the E-Transmission of an executed signature page to a Loan Document shall be as effective as delivery of a manually executed counterpart thereof. The parties may, but are not required to, transmit or otherwise make or communicate any Loan Document as an E-Transmission, except that the Credit Parties shall deliver, as a further condition to Closing, live pen and ink signatures for those Loan Documents to be delivered on or before Closing, that Lender, in its sole discretion, designates as requiring live signatures. From time to time after Closing, each Credit Party agrees to deliver to Lender, upon Lender's request, a live pen and ink signature page for any Loan Document. Where this Agreement or any other Loan Document, including any executed signature pages, is communicated by E-Transmission: (a) this Agreement, such other Loan Document and such signature pages shall conclusively be deemed sufficient to satisfy any requirement for a "writing," "authentication," "signature," or "original" pursuant to any Loan Document or Applicable Law and shall be admissible as an original in any legal proceeding arising out of or relating to this Agreement or any of the other Loan Documents; and (b) each such E-Transmission shall have the same legal effect as a live pen and ink signed paper original. Neither Lender nor any Credit Party shall contest the validity or enforceability of any Loan Document, on the basis that such Loan Document, or one or more signatures hereto or thereto was the subject of an E-Transmission; ***provided, however***, that nothing herein shall limit a party's right to contest whether this Agreement or such other Loan Document has been altered

after E-Transmission or whether the E-Transmission was delivered to an appropriate representative of Lender. "***E-Transmission***" means the communication of any document, including signature pages, by e-mail or any system used to receive or transmit faxes electronically.

8.16 Tombstones; Use of Lender Name. Each Credit Party consents to the publication by Lender of any tombstones, press releases, advertising or other promotional materials (including via E-Transmission) relating to the financing transactions contemplated by this Agreement using such Credit Party's name, product photographs, logo or trademark. Lender shall provide a draft of any such press release, advertising or other promotional material to Borrower for review and comment prior to the publication thereof. Each Credit Party agrees not to issue any press release or other public disclosure using the name or logo of or otherwise referring to Lender or any of its Affiliates, the Loan Documents, or any transaction contemplated thereby, without Lender's prior consent, except to the extent required to do so under Applicable Law and then only after consulting with Lender prior thereto.

8.17 Time of the Essence; Time Periods. Time is of the essence for performance of the Obligations under each of the Loan Documents. Unless otherwise expressly stated in a particular Loan Document, the time for performance of any obligation or taking any action under such Loan Document shall be deemed to expire at 5:00 o'clock p.m. on the last day of the applicable time period provided for in such Loan Document. If the time for performance of any obligation or taking any action under such Loan Document expires on a day other than a Business Day, the time for performance or taking such action shall be extended to the next succeeding Business Day. Unless otherwise expressly stated, references in any of the Loan Documents to a particular time of day shall be to local time in Greenwood Village, Colorado.

8.18 Authorization to Provide Information. Each Credit Party authorizes its banks, creditors (including trade creditors), vendors, suppliers, Franchisor, and customers to disclose and release to the Lender Parties any and all information they may request from time to time regarding (a) any depository, loan or other credit account of such Credit Party; (b) the status of the Franchise Agreement; (c) the affairs and financial condition of such Credit Party, or any operator of the Sites; and (d) the business operations at the Sites, including Site level and entity level operating results. Each Credit Party also expressly authorizes the Lender Parties, from time to time while any of the Obligations are outstanding to perform background, credit, judgment, lien and other checks, searches, inspections and investigations and to obtain personal and business credit reports and asset reports with respect to such Credit Party and to answer questions about its credit experience with such Credit Party. All of the information which the Lender Parties obtain from time to time in accordance with this Section, together with all other information which the Lender Parties now possess or in the future may acquire with respect to any of the Credit Parties, the Collateral, the Credit Facilities, or the business operations at the Sites, whether pursuant to the Loan Documents or otherwise, is referred to as "***Credit Party Information***."

8.19 Permitted Disclosures of Credit Party Information. Each Credit Party authorizes the Lender Parties (each, an "***Authorized Person***") to disclose Credit Party Information: (a) to Franchisor upon the occurrence and during the continuation of a Default; (b) to any proposed transferee, purchaser, assignee, servicer, participant, lender, investor, ratings agency, or other Person with respect to any proposed Lender Transfer or sale of any of the Collateral; (c) to any other Authorized Person or any insurance or title company in connection with the transactions contemplated by the Loan Documents, including any action, suit, or proceeding arising out of, in connection with, or relating to, this Agreement or the other Loan Documents, the Credit Facilities, or any other transaction contemplated hereby; (d) to the extent such information is or becomes available to an Authorized Person from sources not known by such Authorized Person to be subject to disclosure restrictions; (e) to the extent disclosure is required by Applicable Law or other legal process or is requested or demanded by any Government Authority; and (f) as may otherwise be authorized in writing by Borrower. Borrower and each other Credit Party also authorize and consent to the use by the Authorized Persons of data relating to Borrower's operations, including unit-level and corporate level operating results, to produce and distribute various industry statistical analyses and data compilations, provided that all such analyses and data compilations will be aggregated and will not be specifically attributable to the Sites, Borrower, any other Credit Party, or any operator or lessee of the Sites. Each Credit Party agrees that the disclosures permitted by this Section and any other disclosures of Credit Party Information authorized pursuant to any of the Loan Documents may be made even though any such disclosure may involve the transmission or other communication of Credit Party Information from the nation of residence or domicile of such Credit Party or an Authorized Person to another country or jurisdiction, and each Credit Party waives the provisions of any data privacy law, rule, or regulation of any applicable Government Authority that would otherwise apply to the disclosures authorized in this Section.

8.20 Corrections and Insertions. Lender may correct patent errors in the Loan Documents and fill in all blanks in this Agreement and the other Loan Documents consistent with the agreement of the parties.

8.21 Transaction Characterization. The Loan Documents are a contract to extend a Financial Accommodation (as such term is used in the Bankruptcy Code) for Borrower's benefit.

8.22 Further Assurances. At any time and from time to time, upon Lender's written request and at Borrower's sole expense, Borrower shall promptly execute and deliver any and all such further instruments and documents and take such further action as Lender may reasonably deem necessary or advisable to (a) fully implement and obtain the full benefits of this Agreement and the other Loan Documents; (b) protect, preserve, maintain and enforce Lender's rights in (and the priority of Lender's Liens on) any Collateral; and (c) enable Lender to exercise all of its rights, remedies and powers granted in the Loan Documents.

8.23 Accounting Requirements. All accounting terms shall be construed, and all accounting determinations required to be made pursuant to any Loan Document, including with respect to financial covenant compliance, shall, unless otherwise expressly provided, be made, in accordance with GAAP. However, if there is a change in GAAP following the date of this Agreement and that change is implemented by Borrower, such change shall not be given effect if such change would affect a calculation that measures compliance with, or entitles any Credit Party to any rights under, any provision of the Loan Documents unless Borrower and Lender agree in advance and in writing to modify such provisions to reflect such change. Unless such provisions are modified, all Financial Statements, compliance certificates and similar documents provided pursuant to the Loan Documents shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change. Notwithstanding any other provision contained herein or any of the other Loan Documents, all terms of an accounting or financial nature used in this Agreement or any of the other Loan Documents shall be construed, and all computations of amounts and ratios provided for in this Agreement or any of the other Loan Documents shall be made, without giving effect to any election under FAS 159 (ASC 825) (or any other financial accounting standard having a similar result or effect) to value any Indebtedness or other liabilities of any Credit Party at "fair value," as defined therein.

8.24 Interpretation. The Loan Documents shall be interpreted and construed in a fair and impartial manner without regard to such factors as which party prepared the document, the relative bargaining powers of the parties or a party's domicile, but shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties.

8.25 Intentionally Omitted.

8.26 Credit Party Experience and Advisers; No Lender Advice. Each Credit Party represents, warrants, and covenants that (a) such Credit Party (i) **IS EXPERIENCED IN COMPLEX AND SOPHISTICATED BUSINESS MATTERS AND COMMERCIAL FINANCING TRANSACTIONS OF THE TYPE CONTEMPLATED BY THE LOAN DOCUMENTS**; (ii) **HAS HAD SUFFICIENT TIME TO CAREFULLY REVIEW ALL PROVISIONS, TERMS AND CONDITIONS OF EACH LOAN DOCUMENT AND CONSULT WITH SUCH INVESTMENT, TAX, LEGAL, FINANCIAL AND OTHER ADVISERS AS SUCH CREDIT PARTY HAS DEEMED APPROPRIATE**; and (iii) **HAS DETERMINED THAT THE LOAN DOCUMENTS COMPLETELY AND ACCURATELY REFLECT THE FINAL BUSINESS DEAL OF THE PARTIES**; and (b) **NO LENDER PARTY OR ANY EMPLOYEE, AGENT, REPRESENTATIVE, OR ADVISER OF A LENDER PARTY HAS PROVIDED ANY CREDIT PARTY WITH ANY INVESTMENT, TAX, LEGAL, OR FINANCIAL ADVICE OR ACTED AS AN ADVISOR TO ANY CREDIT PARTY WITH RESPECT TO SUCH MATTERS**.

8.27 Entire Agreement. **THE LOAN DOCUMENTS COLLECTIVELY CONSTITUTE THE FINAL EXPRESSION AND ENTIRE WRITTEN AGREEMENT OF LENDER AND THE CREDIT PARTIES WITH RESPECT TO THE SUBJECT MATTER THEREOF; SUPERSEDE ALL PRIOR AND CONTEMPORANEOUS AGREEMENTS, DISCUSSIONS, AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF, WRITTEN OR ORAL, INCLUDING PRIOR LETTERS OF INTEREST, PROPOSAL LETTERS, COMMITMENT LETTERS, FEE LETTERS, CONFIDENTIALITY AGREEMENTS, OR OTHER AGREEMENTS, INVOLVING ANY CREDIT PARTY OR LENDER OR ANY**

**OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE, OR EFFECT; AND MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY ALLEGED ORAL AGREEMENT.** Notwithstanding the foregoing, all Closing Conditions shall continue in effect until such time as the Closing occurs.

8.28 Keep Well. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Credit Party to honor all of its obligations under the Loan Documents in respect of Swap Obligations under any Secured Rate Contract (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section, or otherwise under any other Loan Document, voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the guarantees in respect of Swap Obligations under each Secured Rate Contract have been discharged, or otherwise released or terminated in accordance with the terms of this Agreement. Each Qualified ECP Guarantor intends that this Section constitute, and this Section shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

8.29 Attachments. The following items are attached to and are an integral part of this Agreement:

***Exhibit 1.1***: Collateral Table
***Exhibit 1.3(c)***: DLOC Draw Request
***Exhibit 1.3(d)***: DLOC Draw Conditions and Development Project Final Completion Deliverables
***Exhibit 2.1:*** Closing Conditions
***Exhibit 4.15(g)***: Form of Compliance Certificate
***Exhibit 8.1***: Schedule of Defined Terms

[SIGNATURE PAGES FOLLOW]

**EXECUTED** effective as of the date first set forth above.

**BORROWER:**

**TIG REAPER LLC**, a Delaware limited liability company

By:______________________________
Manisha Patel, Member

By:______________________________
Jiger Patel, Member

Principal Place of Business and Address for Notices:

TIG Reaper, LLC
406 Executive Dr
Langhorne, PA 19047

**LENDER:**

**BANK MIDWEST**, a division of NBH Bank

By: ______________________________
Name: Steven Doulong
Title: Vice President

Address for Notices:

NBH Bank
P.O. Box 26528
Kansas City, MO 64196-6528

**EXHIBIT 1.1**
**COLLATERAL TABLE**

At Closing, the Collateral will include a first priority blanket lien on and security interest in all of Borrower's tangible and intangible personal property, wherever located, including all such property located at or used in connection with the Sites identified below. The Collateral will also include first priority Mortgages on those Sites identified below as Mortgage Sites.

| **Store ID No./Name** | **Permitted Concept** | **Ownership Interest** (Fee or Lease) | **Owner of referenced interest** | **Street Address** | **City** | **State** | **Mortgage Site** (Yes/No) |
|---|---|---|---|---|---|---|---|
| 1261 | Dave's Hot Chicken | Lease | TIG Reaper LLC | 1731 Chestnut Street | Philadelphia | PA | No |
| 1190 | Dave's Hot Chicken | Lease | TIG Reaper LLC | 9173 Roosevelt Boulevard | Philadelphia | PA | No |
| 1247 | Dave's Hot Chicken | Lease | TIG Reaper LLC | 122 Park Avenue | Willow Grove | PA | No |

**EXHIBIT 1.3(c)**
**DLOC DRAW REQUEST**

**BANK MIDWEST**
P.O. Box 26528
Kansas City, MO 64196-6528

Re: Loan Agreement (the "***Agreement***") dated ____________, 20___, between **TIG REAPER LLC**, a Delaware limited liability company ("***Borrower***") and **BANK MIDWEST**, a division of NBH Bank ("***Lender***"). Capitalized terms used in this DLOC Draw Request (the "***Draw Request***") and not defined herein have the meanings given thereto in the Agreement.

1. Request; Disbursement Instructions. Borrower requests a DLOC Draw of $_________________ (the "***Requested Draw***"), to be disbursed by wire transfer to the payee(s) and account(s) designated in the Disbursement Schedule. If disbursement is to an escrow agent, then escrow agent is authorized to further disburse such funds in accordance with a settlement statement prepared by escrow agent and signed by Borrower and approved by Lender.

| **DISBURSEMENT SCHEDULE** | |
|---|---|
| **Payee and Wire Transfer Instructions** | **Amount** |
| Payee Name: ______<br>Account Name: ______<br>Account Number: ______<br>ABA #: ______<br>Bank Name: ______<br>Street Address: ______<br>City, State, and Zip Code: ______<br>Additional Comments or Instructions: ______ | $_________________ |
| Payee Name: ______<br>Account Name: ______<br>Account Number: ______<br>ABA #: ______<br>Bank Name: ______<br>Street Address: ______<br>City, State, and Zip Code: ______<br>Additional Comments or Instructions: ______ | $_________________ |

2. Requested Draw Date. _________________, 20__. Borrower acknowledges that it may take up to ***five Business Days*** after all conditions to funding have been fully satisfied or otherwise waived by Lender to fund the Requested Draw and, consequently, the funding may not occur on the Requested Draw Date.

3. Conditions to Draw. Borrower understands and agrees that Lender's obligation to fund the Requested Draw is subject to Lender's satisfaction with or waiver of, in Lender's sole discretion, each of the DLOC Draw Conditions set forth on ***Exhibit 1.3(d)*** to the Agreement.

4. Borrower Representations, Warranties, and Covenants: As a material inducement to Lender to fund the Requested Draw, Borrower represents and warrants to and covenants with Lender that:

(a) Representations and Warranties. Both before and after funding the Requested Draw, the representations and warranties of each Credit Party in the Loan Documents, including ***Article 3*** of the Agreement, are true and correct in all material respects, as though made as of the date of this Draw Request and will be true and correct as of the date the Requested Draw is funded, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties were true and correct in all material respects as of such date.

(b) No Defaults. As of the date of this Draw Request, no Default has occurred that is continuing. The funding of the Requested Draw will not result in the occurrence of a Default. Borrower is and will be in compliance with the financial covenants in ***Section 4.16*** of the Agreement, both before and, on a pro forma basis, immediately after the Requested Draw is funded.

(c) Authorization and Execution. The individual executing this Draw Request is duly authorized to do so.

(d) Purpose. The Requested Draw will be used as follows, with respect to the listed Site(s):

| **Proposed Use of Draw** | **Name of Entity Using Draw** | **Store #** | **Concept** | **Street Address** | **City** | **ST** | **ZIP** | **Leasehold or Fee Site?** |
|---|---|---|---|---|---|---|---|---|
| ☐ Acquisition<br>☐ Development | | | | | | | | |
| ☐ Acquisition<br>☐ Development | | | | | | | | |

(e) Incurrence Tests. Taking the Requested Draw into account, the incurrence tests included in ***Section 4*** of the DLOC Draw Conditions on ***Exhibit 1.3(d)*** to the Agreement are satisfied. Attached are the Financial Statements and covenant calculations used to determine that such incurrence tests are satisfied. The Financial Statements are complete and correct and have been prepared in accordance with GAAP from period to period and otherwise in compliance with the requirements in the Agreement.

Dated: ____________, 20__.

**BORROWER**:

**TIG REAPER LLC**, a Delaware limited liability company

By: ______________________________
Name: ______________________________
Title: ______________________________

**BORROWER**: Please attach, at the end of this DLOC Draw Request, the Financial Statements and covenant calculations referred in ***Paragraph 4(e)*** above.

**EXHIBIT 1.3(d)**
**DLOC DRAW CONDITIONS**
**AND FINAL COMPLETION DELIVERABLES**

**DLOC DRAW CONDITIONS**: Prior to funding a DLOC Draw, each of the following conditions precedent (the "***DLOC Draw Conditio***ns") shall have been satisfied, at Borrower's sole cost and expense, all as determined by Lender in its sole discretion, unless, Lender, in its sole discretion, waives any such DLOC Draw Condition:

1. Representations and Warranties. The representations and warranties of Borrower set forth in the Draw Request are and will be true, correct and complete, both before and after funding the DLOC Draw.

2. Payment of Costs, Expenses and Fees. All costs, expenses and fees to be paid by Borrower on or before the date of the DLOC Draw, including all related Transaction Costs, shall have been paid in full.

3. No Material Adverse Effect. No Material Adverse Effect shall have occurred since Closing, and there shall be no facts or circumstances existing and not previously disclosed in writing to Lender with respect to any Credit Party, the Collateral, the seller, if any, of the Collateral, any other Person representing or otherwise acting on behalf of a Credit Party, or the transaction that, in Lender's reasonable judgment, are inconsistent in a material and adverse manner with any such information disclosed to Lender prior to Closing.

4. Incurrence Tests. After giving effect to each requested DLOC Draw on a pro-forma basis, Borrower shall be and remain in compliance with all of the financial covenants required under ***Section 4.16*** of this Loan Agreement.

5. Acquisitions. If the DLOC Draw will fund an Acquisition:

   (a) Borrower Equity. Concurrently with the closing of the Acquisition, Borrower shall have paid that portion of the Acquisition purchase price not funded by Lender, as well as all other costs associated with the Acquisition and not financed by Lender.

   (b) Acquisition Documents; Concurrent Closing. Lender shall have received complete, executed copies of the purchase agreement and related documents for each Acquisition Parcel, the terms of which shall be acceptable to Lender, and the Acquisition shall close concurrently with the DLOC Draw funding.

   (c) New Entities. If a particular Acquisition Parcel will be acquired by an entity other than Borrower (a "***New Entity***"), Lender shall have received and approved (i) evidence that the New Entity is an Affiliate of Borrower and is in good standing under the laws of its formation state and in the state where such Acquisition Parcel is located and that the Person(s) executing documents on behalf of the New Entity are duly authorized to do so; and (ii) such additional Loan Documents, executed by the New Entity, as Lender deems necessary or advisable to ensure, among other things, that, concurrently with the acquisition of the Acquisition Parcel, the New Entity is a co-Borrower, jointly and severally, with each other Borrower.

   (d) Site Due Diligence. Lender shall have completed its credit underwriting and due diligence review with respect to the Acquisition and each Acquisition Parcel.

   (e) Collateral Requirements. Borrower shall have delivered to Lender such Mortgage, security agreements, and other documents as Lender may require from Borrower and any other Person having any interest in each Acquisition Parcel and/or the business to be conducted thereat, each in form acceptable to Lender, granting to Lender a first priority Lien on each such Acquisition Parcel and all related personal property, with each such document, upon execution, to be deemed to be a Loan Document; and all such documents and related UCC financing statements shall have been properly filed or recorded in the appropriate governmental office.

(f) Insurance. Borrower shall have delivered to Lender evidence that all insurance required pursuant to ***Section 4.4*** of the Agreement and the Insurance Requirements, including any required flood insurance, has been obtained and is in full force and effect with respect to each Acquisition Parcel.

(g) Title Insurance; Survey. Lender shall have received from a title company acceptable to Lender an ALTA lender's title policy for each Acquisition Parcel for which Lender will require a Mortgage, in such form and amounts and with such endorsements as Lender may require, insuring that Lender's Mortgage is a first priority Lien on such Acquisition Parcel, subject only to exceptions approved by Lender. If, in order to obtain such title insurance, the title company requires an ALTA survey of the Acquisition Parcel, Borrower shall have provided to Lender an ALTA survey of such Acquisition Parcel from a licensed surveyor acceptable to Lender.

(h) Environmental Conditions. Lender shall have received, from consultants approved by Lender, such environmental reports, including phase I environmental site assessments, for each Acquisition Parcel in which Borrower is acquiring the fee real property interest and for each Acquisition Parcel for which Lender will require a Mortgage, and Lender shall have approved the environmental condition of such Acquisition Parcel.

(i) Appraisal. Lender shall have received an appraisal of each Acquisition Parcel for which Lender will require a Mortgage, dated no more than 60 days prior to the date of the Draw Request, that is compliant with Applicable Law and such additional requirements as Lender may specify, performed by state certified appraisers selected by Lender. Lender will order the appraisal.

(j) Franchise Agreements. Fully executed, complete copies of the Franchise Agreements for each Acquisition Parcel, which agreements shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, comfort letters, status certificates, and consents with respect to such agreements as Lender may require.

(k) Leases. Fully executed, complete copies of the Leases for each Acquisition Parcel, which Leases shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, status certificates, and consents with respect to such agreements as Lender may require.

6. Development Projects. If the Requested Draw will fund a Development Project:

(a) Budget; Borrower Equity. Prior to making the first DLOC Draw Request for a particular Development Project, Borrower shall have delivered to Lender and Lender shall have approved a Development Project budget of all costs to be incurred in connection with the Development Project, and Borrower shall have paid (or shall pay concurrently with the funding of the DLOC Draw) that portion of total Development Project costs that are not being financed by Lender.

(b) New Entities. If a site that is proposed to be included in a Development Project is owned by an entity other than Borrower (a "***New Entity***") and such site will not be the subject of an Acquisition, Lender shall have received and approved (i) evidence that the New Entity is an Affiliate of Borrower and is in good standing under the laws of its formation state and in the state where such site is located and that the Person(s) executing documents on behalf of the New Entity are duly authorized to do so; and (ii) such additional Loan Documents, executed by the New Entity, as Lender deems necessary or advisable to ensure, among other things, that the New Entity is a co-Borrower, jointly and severally, with each other Borrower, whereupon such site will be deemed to be a Site as well as a Development Site.

(c) Collateral Requirements. Borrower shall have delivered to Lender such security agreements, and other documents as Lender may require from the Person(s) owning each Development Site

and from any other Person having any interest in each Development Site and/or the business to be conducted thereat, each in form acceptable to Lender, granting to Lender a first priority Lien on each such Development Site and all related personal property, with each such document, upon execution, to be deemed to be a Loan Document; and all such documents and related UCC financing statements shall have been properly filed or recorded in the appropriate governmental office.

(d) Insurance. Borrower shall have delivered to Lender evidence that all insurance required pursuant to ***Section 4.4*** of the Agreement and the Insurance Requirements, including any required flood insurance, has been obtained and is in full force and effect with respect to each Development Site.

(e) Environmental Conditions. Lender shall have received, from consultants approved by Lender, such environmental reports, including phase I environmental site assessments, for each Development Site in which Borrower owns the fee real property interest and for each Development site for which Lender has or will require a Mortgage, and Lender shall have approved the environmental condition of such Development Site.

(f) Title Insurance; Survey. Lender shall have received from a title company acceptable to Lender an ALTA lender's title policy for each Development Site for which Lender has or will require a Mortgage, in such form and amounts and with such endorsements as Lender may require, insuring that Lender's Mortgage is a first priority Lien on such Development Site, subject only to exceptions approved by Lender. If, in order to obtain such title insurance, the title company requires an ALTA survey of the Development Site, Borrower shall have provided to Lender an ALTA survey of such Development Site from a licensed surveyor acceptable to Lender.

(g) Appraisal. Prior to the first DLOC Draw for the Development Project, Lender shall have received an "as completed" appraisal of each Development Site for which Lender has or will require a Mortgage, dated no more than 60 days prior to the date of the first Draw Request, that is compliant with Applicable Law and such additional requirements as Lender may specify, performed by state certified appraisers selected by Lender. Lender will order the appraisal.

(h) General Contractor. Lender shall have approved the general contractor for the Development Project, which approval shall not be unreasonably withheld.

(i) Permits. Borrower shall have obtained and provided to Lender: (i) prior to the first DLOC Draw for such Development Project, all building and other permits and licenses as are required by the applicable Government Authority in connection with such Development Project; and (ii) prior to each subsequent DLOC Draw for such Development Project, such inspection reports, permits and approvals as are required by the applicable Government Authority at the applicable stage of the progress of construction, including any updates to the permits, licenses, and approvals referenced in ***clause (i)***.

(j) Lien Waivers. Borrower shall have delivered to Lender: (a) conditional lien waivers (conditioned only on the payment of the money specified) from all contractors, subcontractors, and suppliers who have performed work or provided labor or materials as part of such Development Project and who will receive proceeds from the requested DLOC Draw; and (b) unconditional lien waivers for all prior DLOC Draws.

(k) Inspections. If the Development Project budget exceeds $2,500,000, Lender and/or a third-party construction consultant retained by Lender shall have conducted such inspections of the Development Project as Lender shall require, and Lender shall have approved all inspection reports provided by such construction consultant, if applicable. All such inspections shall be for Lender's sole benefit.

(l) Invoices. If required by Lender, Borrower shall have delivered to Lender copies of each invoice or receipt for items to be funded from the DLOC Draw, if such invoice or receipt is greater than $50,000.

**FINAL COMPLETION DELIVERABLES**: The "***Final Completion Deliverables***" are as follows:

1. Lease. A fully executed, complete copy of the Lease for each Development Site that is a Leased Site.

2. Title Insurance and Surveys. For each Development Site that is a Mortgage Site, such title insurance policies and endorsements as Lender may require in its sole discretion, together with an ALTA "as built" survey certified to Lender and the title company, if required by the title company to issue the title insurance and endorsements required by Lender.

3. Lien Waivers. For each Development Site that is a Mortgage Site, Lender shall have received and approved, in its sole discretion, unconditional lien waivers and releases reflecting final payment from the general contractor, each construction contractor, each subcontractor, and each supplier.

4. Final Inspections. Lender and/or a third-party construction consultant retained by Lender shall have conducted such final inspections of the Development Project as Lender shall require, and Lender shall have approved all inspection reports provided by such construction consultant, if applicable. All such inspections shall be for Lender's sole benefit.

5. Final Permits. Borrower shall have obtained and provided to Lender all final building and other permits and licenses as are required by the applicable Government Authority in connection with such Development Project, including the final certificate of occupancy.

6. Franchise Agreements. Fully executed, complete copies of the Franchise Agreements for each Development Site, which agreements shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, comfort letters, status certificates, and consents with respect to such agreements as Lender may require.

**EXHIBIT 2.1**
**CLOSING CONDITIONS**

Lender's obligation to close the Loan is subject to Lender's satisfaction with or waiver of, in Lender's sole discretion, the following conditions, including required deliverables, each at Borrower's expense:

1. Due Diligence. Lender shall have received and approved all items, documents and information required by Lender in connection with its credit underwriting and due diligence for the Loan and shall have completed such credit underwriting and due diligence with respect to Borrower, Guarantor, the Loan, the Collateral, and all aspects of the Site as Lender deems appropriate, and the results of such underwriting and due diligence are satisfactory to Lender, in its sole discretion.

2. Payments. All costs, expenses and fees to be paid by Borrower on or before Closing shall have been paid, which payment may be made at the direction of Borrower (and with Lender's reasonable approval) from the Loan proceeds to the extent such proceeds exceed the aggregate amount of the indebtedness being refinanced with the Loan.

3. No Default; Representations. No Default has occurred and is continuing or would occur as a result of the consummation of the transactions at the Closing. All representations and warranties of each of the Credit Parties in Loan Documents signed by such Credit Party are true, correct, and complete in all material respects.

4. Executed Loan Documents. Lender shall have received the following Loan Documents, together with all such other documents and instruments as Lender may require, in each case duly executed and, where appropriate, acknowledged, by all parties thereto, other than Lender, each in form and substance satisfactory to Lender:

(a) This Agreement;

(b) The Term Loan A Note;

(c) The DLOC Note;

(d) The Guaranty;

(e) A security agreement, pledge agreement and/or collateral assignment from each person having an interest in the personal property Collateral, including all Persons named as franchisees in the Franchise Agreement for the Site; and

(f) A Borrower authorization.

5. Financing Statements. Lender shall have received evidence that appropriate financing statements have been properly filed with the appropriate Government Authority and that the security interests of Lender in all personal property Collateral are in first lien position, subject only to applicable permitted exceptions.

6. Deliverables. Borrower shall have delivered to Lender, or Lender shall otherwise have obtained, and Lender shall have approved, the following, together with such other information and documentation as Lender may reasonably require, all at Borrower's expense:

(a) Evidence that Existing Debt Paid. Evidence that all outstanding seller financing, indebtedness owed to any of Borrower's shareholders, members, partners, or principals and all other indebtedness owed to any third party, excluding indebtedness held by Lender or its affiliates, has been paid in full.

(b) Insurance. Evidence that all insurance that Borrower is required to have at Closing pursuant to ***Section 4.4*** has been obtained, is in full force and effect, and complies with the requirements of the Loan Documents.

(c) Franchise Agreements. Fully executed, complete copies of the Franchise Agreements, which agreements shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, comfort letters, status certificates, and consents with respect to such agreements as Lender may require.

(d) Leases. Fully executed, complete copies of the Leases, which Leases shall be in full force and effect, with expiration dates, including all renewal and extension options, of not less than the Loan maturity date and otherwise in form and substance satisfactory to Lender, and Lender shall have received such executed subordination agreements, collateral assignments, status certificates, and consents with respect to such agreements as Lender may require.

(e) Legal Opinions. Such legal opinions as Lender may require, in form and substance and from counsel satisfactory to Lender.

7. Site Visits/Conditions. Lender shall have made the Site visits as may be required by Lender and approved the location and site characteristics of each Site.

8. In-Person Meetings. Satisfactory in-person meetings with ownership and/or management of Borrower as required by Lender.

9. Other Conditions. All other conditions to Lender's obligations to close the Loan have been satisfied.

**EXHIBIT 4.15(g)**
**COMPLIANCE CERTIFICATE FORM**

**BANK MIDWEST**
P.O. Box 26528
Kansas City, MO 64196-6528

Re: Loan Agreement (the "***Agreement***") dated ______________, 202___, between **TIG REAPER LLC**, a Delaware limited liability company ("***Borrower***") and **BANK MIDWEST**, a division of NBH Bank ("***Lender***"). Capitalized terms used in this Compliance Certificate and not defined herein have the meanings given to those terms in the Agreement.

The undersigned certifies the following to Lender, as of the date of this Compliance Certificate:

1. The attached Financial Statements, bank statements, brokerage statements and all other evidence of Liquid Assets are complete and true and have been prepared in accordance with GAAP from period to period and otherwise in compliance with the requirements stated in the Agreement.

2. Borrower is in compliance with all financial covenants contained in the Agreement, including each of the financial covenant requirements set forth below. The covenant calculations used in determining compliance with the following financial covenants are attached to this Compliance Certificate as ***Schedule 1***.

(a) New Store Post-Compensation Consolidated FCCR must be ≥ 1.15:1 for the period ending _______, 20__ for each New Store. The ratio as of the end of such period is as follows for each of the following New Stores:

(1) [Insert Address] ____:1.

(b) Mature Stores Post-Compensation Consolidated FCCR must be ≥ 1.15:1 for the period ending _______, 20__. The ratio as of the end of such period is __________ :1.

(c) Liquid Asset of Guarantor and Borrower must be at least $1,500,000.00 for the period ending ____________, 20_____. The Liquid Assets as at the end of such period is $___________.

3. No Default has occurred that is continuing, except for the following, as to which Borrower is taking the actions listed in order to cure such Default: If none, so state.

| DEFAULT | CURE ACTIONS |
|---|---|
| | |

4. Since the Closing Date and except as disclosed in prior Compliance Certificates delivered to Lender, neither Borrower nor any other Credit Party has:

Changed its legal name, identity, jurisdiction of incorporation, organization or formation or organizational structure or formed or acquired any subsidiary except as follows: __________________;

Acquired the assets of, or merged or consolidated with or into, any Person, except as follows: __________________________; or

Changed its address or otherwise relocated, except as follows: _____________.

Dated: ___________, 20__

**BORROWER:**

**TIG REAPER LLC**, a Delaware limited liability company

By: ______________________________________________
Name: ____________________________________________
Title: _____________________________________________

Before submitting this Compliance Certificate to the Lender, please attach the financial covenant compliance calculations at the end of the document.

**EXHIBIT 8.1**
**SCHEDULE OF DEFINED TERMS**

1. Defined Terms. The following terms have the meanings set forth below:

"***Account Collateral***" means (a) all deposit accounts of Borrower held by Lender; (b) all cash, checks, wire transfers, drafts, certificates, instruments and funds deposited or held in, credited to or made to such deposit accounts; (c) all interest, dividends, cash, and other property received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing; and (d) all "proceeds" (as defined in the UCC), replacements and substitutions of any or all of the foregoing.

"***Affiliate***" means, with respect to a Person, each officer, director, manager, general partner, or joint-venturer of such Person and any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with, such Person.

"***Applicable Law***" means, as to a Person, any law (statutory or common), ordinance, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or Government Authority, in each case applicable to or binding on such Person or any of its assets or to which such Person or any of its assets is subject.

"***Beneficial Ownership Certification***" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***" means 31 C.F.R. § 1010.230.

"***Business Day***" means any day of the year that is not a Saturday, Sunday or a day on which banks are required or authorized to close in Greenwood Village, Colorado or New York, New York.

"***Capital Lease***" means any lease or similar arrangement that is classed as a capital lease pursuant to GAAP.

"***Collateral***" means all real and personal property, tangible and intangible, as to which Lender is granted a Lien pursuant to any Loan Document, and any other property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a Lien in favor of Lender, with references to "Collateral" to include all or any portion of or interest in any of the Collateral.

"***Commodity Exchange Act***" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"***Contractual Obligation***" means as to any Person, any provision of any security issued by such Person or of any agreement, instrument, or other undertaking (other than a Loan Document) to which such Person is a party or by which it or any of its property is bound or subject, including each Franchise Agreement and each Lease.

"***Control***" and "***Controlled***" means possession of either (a) the power to vote, or the beneficial ownership of, 10% or more of any class of voting securities (or other ownership interests) of such Person; or (b) the power to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"***Credit Facilities Maturity Date***" means September 1, 2029.

"***Credit Party***" means Borrower, each Guarantor and each other Person (other than Lender) that is or may become a party to this Agreement or any other Loan Document.

"***Default***" means any Event of Default (as defined in ***Article 6***) or any event or circumstance that, with the passage of time or the giving of notice or both, would (if not cured or otherwise remedied during such time) become an Event of Default.

"***Excluded Rate Contract Obligation***" means, with respect to any Credit Party, any guarantee of any Swap Obligations under a Secured Rate Contract if, and only to the extent that and for so long as, all or a portion of the guarantee of such Credit Party of, or the grant by such Credit Party of a security interest to secure, such Swap Obligation under a Secured Rate Contract (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Credit Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Credit Party or the grant of such security interest becomes effective with respect to such Swap Obligation under a Secured Rate Contract. If a Swap Obligation under a Secured Rate Contract arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation under a Secured Rate Contract that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"***Franchise Agreement***" means the franchise agreement, area development agreement, or similar agreement relating to a particular Site, granted by the franchisor named in such agreement ("***Franchisor***"), together with all amendments, assignments, restatements, extensions, supplements, and exhibits thereto, that grants to Borrower the right to develop and operate such Site as the Permitted Concept.

"***GAAP***" means generally accepted accounting principles in the United States, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board and in such other statements by such other entity as may be in general use by significant segments of the accounting profession that are applicable to the circumstances as of the date of determination.

"***Good Faith Contest***" means the contest as to which all of the following conditions have been satisfied: (a) Borrower delivers prompt notice to Lender of such contest and the nonpayment of any contested amount; (b) no Default or Event of Default exists; (c) such contest is diligently pursued and made and performed in accordance with Applicable Law; (d) nonpayment of the amounts being contested will not result in the sale, loss, forfeiture or diminution of the Collateral or impairment of any Lien in favor of Lender; (e) Borrower either, in Lender's reasonable discretion, (i) deposits adequate reserves with Lender for the payment of the applicable amounts being contested, together with all interest and penalties thereon, or (ii) provides evidence that Borrower holds sufficient funds to pay such amount, and (f) promptly after such contest or in the event litigation is commenced by the holder thereof, Borrower shall pay any such amounts (and fees, penalties, interest and other sums payable).

"***Government Authority***" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"***Guaranty***" means a guaranty agreement pursuant to which one or more Persons (each, a "***Guarantor***", with references in the Loan Documents to "Guarantor" to mean and include each such Guarantor) guarantees payment and performance of all of the Obligations.

"***Indebtedness***" means, without duplication, all of the following, whether or not matured: (a) indebtedness for borrowed money, including the outstanding balances of any revolving lines of credit; (b) obligations evidenced by bonds, debentures, notes, or similar instruments; (c) reimbursement and other obligations with respect to letters of credit and acceptances; (d) obligations representing the deferred purchase price of property or services; (e) obligations created or arising under any conditional sale or other title retention agreement; (f) obligations with respect to Capital Leases; and (g) any other obligation for borrowed money or other financial accommodation (direct or contingent), whether evidenced by a note, instrument, guaranty or other writing and whether contingent, unliquidated or disputed.

"***Lease***" means the lease for a particular Site (each, a "***Leased Site***"), if Borrower's interest in such Site is a leasehold, together with all amendments, assignments, restatements, extensions, supplements, and exhibits thereto, as in effect on the Closing and in the future (the landlord/lessor under such Lease, being referred to as "***Lessor***").

"***Lender Party***" means each of Lender and its Affiliates.

"***Liabilities***" means all claims, actions, suits, judgments, damages, losses, liabilities, obligations, fines, penalties, sanctions, costs, fees, Taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature, including fees, charges and disbursements of financial, legal and other advisors and consultants (including those incurred in connection with responding to subpoenas or other discovery requests, third party or otherwise) and including interest accrued thereon or as a result thereof, whether joint or several, and whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"***Lien***" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, lien (statutory or other), security interest, including purchase money security interests, and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"***Loan Documents***" means, collectively, this Agreement; each Note; the Guaranty; each Mortgage; and each security agreement, stock pledge agreement, subordination agreement, environmental indemnity agreement, request for Draws, cross-default and/or cross-collateral agreement, and each other document or instrument now or hereafter executed and delivered by any Credit Party in connection with the Credit Facilities or any of the foregoing, with references in the Loan Documents to a particular Loan Document to mean such Loan Document, as it may be amended, restated, supplemented, extended or renewed from time to time. Each Exhibit, Schedule, Table, or Appendix attached to a Loan Document is an integral part of such Loan Document, the same as if set forth in full in the body thereof.

"***Material Adverse Effect***" means any fact, event, circumstance or other effect (including changes in market conditions), whether foreseeable or unforeseeable, that alone or in combination with other facts, events, circumstances, or effects occurring or existing concurrently with such fact, event, circumstance, or effect results in or causes, or could reasonably be expected to result in or cause, a material adverse change in any of (a) the condition (financial or otherwise), business, performance, operations or assets of any Credit Party; (b) the ability of any Credit Party to perform its obligations under any Loan Document; (c) the validity or enforceability of any Loan Document or the rights and remedies of Lender under any Loan Document; or (d) the Collateral, Lender's Liens in the Collateral, or the priority of such Liens.

"***Mature Stores Post-Compensation Consolidated FCCR***" means, with respect to the 12-month period of time immediately preceding the date of determination, the ratio, calculated for Borrower and its consolidated Subsidiaries for such time period calculated solely with respect to Mature Stores, each as determined (and defined, as applicable) in accordance with GAAP, of: (i) the sum of net income, interest expense, income taxes, depreciation, amortization, and Operating Lease Expenses, plus or minus other non-cash adjustments or non-recurring items (as allowed by Lender), minus unfinanced capital expenditures, minus all federal and state income taxes paid in cash, minus increases in officer or shareholder loan receivables, and minus dividends or distributions paid in cash not otherwise expensed on the applicable income statement(s); to (ii) interest expense (excluding non-cash interest expense and amortization of non-cash financing expenses), principal payments on long term debt, the sum of Operating Lease Expenses and the current portion of all Capital Leases; ***provided, however***, for purposes of calculating the foregoing: (1) if in determining "net income" there are general expenses that are attributable to Sites other than such Mature Stores, such expenses shall be determined on a pro rata basis based upon percentage of gross income of the Mature Stores to all Sites, (2) interest expenses, amortization, and principal payments on long term debt shall be determined based solely upon the Indebtedness (including the Loan) incurred and attributable solely with respect to such Mature Stores, and (3) increases in officer or shareholder loan receivables, dividends or distributions shall be determined on a pro rata basis based upon percentage of gross income of the Mature Stores to all Sites, each which of which shall be determined and calculated by Lender in its sole and absolute discretion.

"***Mortgage***" means each mortgage, deed of trust, or similar document granting a Lien to Lender with respect to a particular Site (each, a "***Mortgage Site***"), with references in the Loan Documents to "Mortgage" being to each such Mortgage.

"***New Store Post-Compensation Consolidated FCCR***" means, with respect to the 3-month period of time immediately preceding the date of determination for each New Store, the ratio, calculated for such New Store for such time period, as determined (and defined, as applicable) in accordance with GAAP, of: (i) the sum of net income, interest expense, income taxes, depreciation, amortization, and Operating Lease Expenses, plus or minus other non-

cash adjustments or non-recurring items (as allowed by Lender), minus unfinanced capital expenditures, minus all federal and state income taxes paid in cash, minus increases in officer or shareholder loan receivables, and minus dividends or distributions paid in cash not otherwise expensed on the applicable income statement(s); to (ii) interest expense (excluding non-cash interest expense and amortization of non-cash financing expenses), principal payments on long term debt, the sum of Operating Lease Expenses and the current portion of all Capital Leases; ***provided, however***, for purposes of calculating the foregoing: (1) if in determining "net income" there are general expenses that are attributable to Sites other than such New Store, such expenses shall be determined on a pro rata basis based upon percentage of gross income of the New Store to all Sites, (2) interest expenses, amortization, and principal payments on long term debt shall be determined based solely upon the Indebtedness (including the Loan) attributable and incurred with respect to such New Store, and (3) increases in officer or shareholder loan receivables, dividends or distributions shall be determined on a pro rata basis based upon percentage of gross income of the New Store to all Sites, each which of which shall be determined and calculated by Lender in its sole and absolute discretion.

"***Obligations***" means all amounts, obligations, liabilities, covenants and duties of every type and description (including for the payment of money), owing by any Credit Party to any Lender Party, or any Secured Swap Provider (other than Excluded Rate Contract Obligations), arising out of, under, or in connection with any Loan Document or any Related Agreement, whether direct or indirect, absolute or contingent, due or to become due, liquidated or not, now existing or hereafter arising, however acquired, and whether or not evidenced by any instrument; ***provided, however***, that Obligations of any Borrower or Guarantor shall not include any Excluded Rate Contract Obligations solely of such Borrower or Guarantor.

"***Operating Lease Expenses***" means all rent paid in cash, including any percentage rent (but excluding from "rent" any Taxes, insurance, common area maintenance, or other similar charges even if denominated as "rent"), incurred by Borrower or any of its consolidated Subsidiaries with respect to each Lease and with respect to any and all other operating leases or subleases during the period of determination, all determined in accordance with GAAP.

"***Permitted Concept***" means the concept set forth for a particular Site in the Collateral Table or such other concept as may be approved by Lender in its sole discretion for a particular Site.

"***Permitted Exceptions***" means (a) recorded easements, covenants, conditions, restrictions, encumbrances, and other matters of record affecting the Collateral and approved by Lender in its sole discretion, including each Lease; (b) the Lien for current real property taxes and assessments, not yet due and payable, with respect to any real property Collateral; (c) landlord's liens imposed or implied by law; and (d) Liens in favor of a Lender Party.

"***Permitted Tax Distributions***" means dividends and distributions by Borrower to members and other equity holders of Borrower in the aggregate amount necessary for such equity holders to pay their state and federal income tax liabilities in respect of income earned by the Borrower during the applicable taxable period, provided that Borrower was treated under the Code as a partnership, an "S corporation" or substantially similar pass-through entity for federal income tax purposes during such taxable period, so long as no Event of Default or Default would occur after giving effect to the making of any such dividend or distribution.

"***Person***" means any individual, partnership, corporation, business trust, public benefit corporation, joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Government Authority.

"***Qualified ECP Guarantor***" means, in respect of any Swap Obligation under a Secured Rate Contract, each Credit Party that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation under a Secured Rate Contract or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"***Rate Contracts***" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) and any other agreements or arrangements designed to provide protection against fluctuations in interest or currency exchange rates.

"***Related Agreement***" means each agreement, document, and instrument, other than the Loan Documents, now or hereafter existing between, or by, any Credit Party or Affiliate of a Credit Party (including as a successor in interest) and, or for the benefit of, Lender or any Lender Affiliate (including, in each case, as a successor in interest) or any Secured Swap Provider, including Secured Rate Contracts, as any such agreement, document, or instrument may be amended, restated, supplemented, extended or renewed from time to time.

"***Related Agreement Obligor***" means and includes each Person obligated under a Related Agreement, other than the Lender or any of its Affiliates and the Secured Swap Provider.

"***Secured Rate Contract***" means any Rate Contract between Borrower and the counterparty thereto, which (i) has been provided or arranged by Lender or an Affiliate of Lender; or (ii) Lender has acknowledged in writing constitutes a "Secured Rate Contract" hereunder.

"***Secured Swap Provider***" means (i) Lender or an Affiliate of Lender (or a Person who was Lender or an Affiliate of a Lender at the time of execution and delivery of a Rate Contract) who has entered into a Secured Rate Contract with Borrower; or (ii) a Person with whom Borrower has entered into a Secured Rate Contract provided or arranged by Lender or an Affiliate of Lender, and any assignee thereof.

"***Site***" means (a) each site listed in the Collateral Table and (b) each other business property that now or hereafter constitutes Collateral or at which any Collateral is located (including each Development Site and, upon acquisition, each Acquisition Parcel), in each case including the buildings and improvements thereon and rights and privileges appurtenant thereto. All references in the Loan Documents to "Site" shall mean each such Site.

"***Solvent***" means, with respect to any Person as of any date of determination, that, as of such date, (a) the value of the assets of such Person (both at fair value and present fair saleable value) is greater than the total amount of liabilities (including contingent and unliquidated liabilities) of such Person; (b) such Person is able to pay all liabilities of such Person as such liabilities mature; and (c) such Person does not have unreasonably small capital. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities shall be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"***Subsidiary***" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, association or other entity, the management of which is, directly or indirectly, controlled by, or of which an aggregate of more than 50% of the voting securities or ownership interests are, at the time, owned or controlled directly or indirectly by, such Person or one or more Subsidiaries of such Person.

"***Swap Obligation***" means, with respect to any Credit Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"***UCC***" means the Uniform Commercial Code as in effect from time to time in the State of Colorado.

2. Interpretative Rules. Unless otherwise expressly provided or the context may otherwise require: (a) the words "***hereof***", "***herein***", "***hereunder***" and words of similar import, when used in a Loan Document, shall refer to such Loan Document as a whole and not to any particular provision hereof or thereof; (b) in the computation of time periods from a specified date to a later specified date, the term "***from***" means "***from and including***" and the words "***to***" and "***until***" each mean "***to but excluding***" and the word "***through***" means "***to and including***" and the term "***including***" means "***including without limitation***"; (c) the term "***incur***" means incur, create, make, issue, assume or otherwise become directly or indirectly liable in respect of or responsible for, in each case whether directly or indirectly, and the terms "incurrence" and "incurred" and similar derivatives shall have correlative meanings; (d) the term "***sole***" means "***sole and absolute***"; (e) Article, Section, subsection, clause, Appendix, Exhibit, Schedule, and Table references in a Loan Document are to such items in or attached to such Loan Document; (f) references to a Loan Document include all exhibits, schedules, and appendices thereto and, unless Lender's consent is required therefor but was not obtained, any amendment, restatement, or supplement thereto; (g) references to any statute, law, ordinance, regulation or rule are to such statute, law, ordinance, regulation or rule, as modified from time to time and to any

successor to any such statute, law, ordinance, regulation or rule, in each case as in effect at the time any such reference is operative; (h) Article, Section, subsection, Appendix, Exhibit, Schedule and Table titles and other divisions contained in any Loan Document are without substantive meaning or content of any kind and are not a part of the agreement between the parties; (i) the meaning of any term defined (including by reference) in any Loan Document shall be equally applicable to both the singular and plural forms of such term; and (j) references to days, months, and years are to calendar days, months, or years, unless otherwise defined.