**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BANK MIDWEST, a division of NBH Bank,<br><br>Plaintiff,<br><br>v.<br><br>TIG REAPER LLC, REAPER TIME NJ 1 LLC, REAPER TIME PA 1 LLC, and REAPER TIME PA 2 LLC,<br><br>Defendants. | Case No. 2:26-cv-06748 |

**PLAINTIFF'S EMERGENCY MOTION FOR APPOINTMENT OF RECEIVER AND <u>MEMORANDUM OF LAW IN SUPPORT THEREOF</u>**

COMES NOW, Bank Midwest, a division of NBH Bank ("Plaintiff" or "Lender") and files this Emergency Motion for Appointment of Receiver and Memorandum of Law in Support Thereof (the "Motion") seeking a receiver over TIG REAPER LLC, REAPER TIME NJ 1 LLC, REAPER TIME PA 1 LLC, REAPER TIME PA 2 LLC (collectively, "Borrower" or "Defendants"), showing the Court as follows:

## <u>BACKGROUND</u>

### A. The Loan Documents

In August 2024, Plaintiff made a loan to TIG Reaper LLC in the original principal amount of $1,650,000.00 (the "Term Loan") evidenced by that certain Term Loan A Note dated August 15, 2024 (as amended and/or modified the "Term Note") executed by TIG Reaper LLC in favor of Plaintiff. (Doc. No. 1, Complaint ("Compl."), ¶ 13.) Also in August 2024, Plaintiff made a loan to TIG Reaper LLC in the original principal amount of $8,350,000.00 (the "DLOC Loan", together with the Term Loan, the "Loans") evidenced by that certain DLOC Note (the "DLOC Note", together with the Term Note, the "Notes") executed by TIG Reaper LLC in favor of Plaintiff. (*Id.*,

¶ 14.) On or about August 15, 2024, TIG Reaper LLC and Plaintiff executed that certain Loan Agreement (the "Loan Agreement"). (*Id.*, ¶ 15.) On or about August 15, 2024, TIG Reaper LLC executed that certain Security Agreement (the "Security Agreement") in favor of Plaintiff and granted Plaintiff a first-priority security interest in all of TIG Reaper LLC's assets. (*Id.*, ¶ 16.)

On or about November 14, 2025, Borrower, Manisha Patel ("Guarantor") and Plaintiff executed that certain Loan Assumption and First Modification Agreement (the "Modification Agreement", together with the Term Note, DLOC Note, Loan Agreement, Security Agreement and all documents executed in connection therewith and/or related thereto, together with all amendments and/or modifications thereof are collectively, the "Loan Documents"). (*Id.*, ¶ 17.) Pursuant to the Modification Agreement, Reaper Time NJ 1 LLC, Reaper Time PA 1 LLC and Reaper Time PA 2 LLC (collectively, "Additional Borrower") agreed to, jointly and severally with TIG Reaper LLC, (a) assume all obligations, liabilities, covenants, representations and warranties of TIG Reaper LLC under the Loan Documents, (b) assume and pay the amounts owed on the Loans, and (c) assume, be bound by and liable for, comply with and perform all duties, obligations, provisions and covenants of "Borrower" or "Debtor" under the Loan Documents. (*Id.*, ¶ 18, Ex. E, § 2.1.) Additional Borrower granted to Plaintiff a lien, encumbrance and security interest in and to all of the Collateral owned by Additional Borrower. (*Id.*, ¶ 18, Ex. E, § 2.2.) As a result of the Modification Agreement, TIG Reaper LLC and Additional Borrower are jointly and severally the "Borrower", "Assignor", "Grantor", and "Debtor" under each of the Loan Documents as if TIG Reaper LLC and Additional Borrower had executed and delivered each of the Loan Documents, and are jointly and severally liable as "Debtor" under the Security Agreement. (*Id.*, ¶ 19, Ex. E, § 2.3.)

**B. The Defaults**

Pursuant to the Loan Agreement, Borrower is required to do the following:

a. pay all taxes prior to delinquency (Ex. C, § 4.3);

b. provide Lender with complete Financial Statements within 45 days of each Fiscal Quarter, including a Compliance Certificate (Ex. C, §§ 4.15(a)(i), 4.15(c));

c. deliver to Lender bank and brokerage statements evidencing the liquidity of Guarantor for each Fiscal Quarter (Ex. C, § 4.15(a)(ii);

d. together with Guarantor, maintain aggregate Liquid Assets of at least $1,500,000, as confirmed by a Compliance Certificate delivered by Borrower pursuant to Section 4.15(g) of the Loan Agreement (Ex. C, § 4.16(c));

e. maintain Lender as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity and other deposit accounts for the conduct of Borrower's business (Ex. C, § 4.21); and

f. not create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to an Indebtedness, other than the Obligations and trade indebtedness incurred in the ordinary course of business

(*Id*., ¶ 20, Ex. C, § 5.12.) Under the Loan Agreement, an Event of Default occurs when, among other things, any Credit Party fails to observe any of the covenants or obligations of the Loan Agreement or any of the other Loan Documents. (*Id*., ¶ 21, Ex. C, § 6.1(c).)

On July 20, 2026, Lender notified Borrower and Guarantor that they were in default under the Loan Documents. (*Id*., ¶ 22.) On July 22, 2026, Lender again notified Borrower and Guarantor that they were in default under the Loan Documents and Lender accelerated the indebtedness owed

under the Loan Documents, a copy of which was provided to Dave's Hot Chicken Franchise Co., LLC ("Franchisor"). (*Id.*, ¶ 23.) On August 20, 2026, Lender notified Borrower, Guarantor and Franchisor of additional events of default under the Loan Documents. (*Id.*, ¶ 24.)

Events of Default occurred under the Loan Agreement because, among other things (the "Existing Events of Default"):

a. Guarantor and Borrower failed to maintain aggregate Liquid Assets of at least $1,500,000 as of the most recent financial reporting delivered to Lender;

b. Borrower failed to maintain Lender as its principal depository bank, including for the maintenance of operating, administrative, cash management, collection activity, and other deposit accounts for the conduct of Borrower's business;

c. Borrower created, incurred, assumed, permitted to exist, or otherwise became directly or indirectly liable with respect to any Indebtedness, other than the Obligations and trade indebtedness incurred in the ordinary course of business;

d. Borrower's Q1 2026 and Q2 2026 financial reporting did not include a signed Compliance Certificate, as required by Section 4.15(g) of the Loan Agreement;

e. Borrower failed to provide bank and brokerage statements evidencing the liquidity of Guarantor as of Q2 2026, as required by Section 4.15(a)(ii) of the Loan Agreement;

f. Borrower's Q2 2026 financials reflect that Borrower had only $84,477 in cash on hand as of June 30, 2026, which is a significant reduction from the $536,369 that Borrower had as of December 31, 2025. Accordingly, it appears that the minimum Liquid Assets requirement was not satisfied for Q2 2026, as required by Section 4.15(g) of the Loan Agreement;

g. Borrower's Q2 2026 financials reflect outstanding sales taxes of $424,125, evidencing a failure of Borrower to pay all taxes as and when due, as required by Section 4.3 of the Loan Agreement;

h. Borrower failed to keep the Collateral free and clear of all liens, as evidenced by the UCC Financing Statement filed on January 22, 2026 by Corporation Service Company, in violation of Section 4.2 of the Loan Agreement; and

i. Borrower's Q2 2026 financials reflects accounts payable of $2,311,900 for Q2 2026, thereby indicating that Borrower has failed to pay all Indebtedness, including trade debt, within 60 days of incurrence, in violation of Section 4.11 of the Loan Agreement.

(*Id.*, ¶ 25.) To date, Borrower and Guarantor failed to pay the amounts owed under the Loan Documents and failed to cure the foregoing Existing Events of Default. (*Id.*, ¶ 26.)

As of September 8, 2026, an amount not less than $8,842,281.45 is owed under the Loan Documents. Interest and attorneys' fees and expenses continue to accrue. (*Id.*, ¶ 27.)

In addition to the amounts owed under the Loan Documents, all assets owned by Borrower secure the indebtedness owed to Lender by Borrower's affiliates TIG QUESO LLC, QUESO TIME DE 1 LLC, QUESO TIME DE 2 LLC, QUESO TIME DE 3 LLC, QUESO TIME DE 4 LLC, QUESO TIME DE 5 LLC, QUESO TIME TPA1 LLC, QUESO TIME TPA2 LLC, QUESO TIME TPA3 LLC, QUESO TIME NJ 1 LLC, QUESO TIME NJ 10 LLC, QUESO TIME NJ 11 LLC, QUESO TIME NJ 12 LLC, QUESO TIME NJ 17 LLC, QUESO TIME NJ 2 LLC, QUESO TIME NJ 20 LLC, QUESO TIME NJ 3 LLC, QUESO TIME NJ 4 LLC, QUESO TIME NJ 5 LLC, QUESO TIME NJ 6 LLC, QUESO TIME NJ 9 LLC, QUESO TIME NJ 15 LLC, QUESO TIME NJ 18 LLC, QUESO TIME NJ 19 LLC, QUESO TIME NJ 21 LLC, QUESO TIME NJ 22 LLC,

QUESO TIME NY 1 LLC, QUESO TIME NY 2 LLC, QUESO TIME NY 3 LLC, QUESO TIME NY 4 LLC, QUESO TIME PA 1 LLC, QUESO TIME PA 10 LLC, QUESO TIME PA 11 LLC, QUESO TIME PA 2 LLC, QUESO TIME PA 3 LLC, QUESO TIME PA 6 LLC, QUESO TIME PA 7 LLC, QUESO TIME PA 8 LLC, QUESO TIME PA 9 LLC, QUESO TIME PA 12 LLC, TIG QUESO NY LLC, TIG QUESO DE LLC, TIG QUESO NJ LLC, TIG QUESO PA LLC, TIG QUESO FL LLC (collectively, "Queso Borrower"). (*Id*., ¶ 28.)

The Security Agreement states as follows:

> 3. Secured Obligations. This security interest is given to secure the payment and performance of the Obligations, including all Indebtedness under the Note **and all Obligations with respect to the Related Agreements**, as such Related Agreements may be amended, restated, supplemented, extended or renewed from time to time. To the extent that any Obligation secured hereby is held by an Affiliate of Lender, rather than directly by Lender, Debtor acknowledges and agrees that Lender is acting both for itself, with respect to the Obligations held by Lender, and as agent for and on behalf of such Affiliate with respect to Obligations held by such Affiliate and that Lender shall be entitled, both on its own behalf and as agent for and on behalf of such Affiliate, to exercise all rights and remedies of the secured party under this Agreement.

(*Id*., ¶ 29, Ex. D, § 3 (emphasis added.)

The Security Agreement contains the following relevant defined terms:

> "***Affiliate***" means, with respect to a Person, each officer, director, manager, general partner, or joint-venturer of such Person and any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with, such Person.
>
> "***Control***" and "***Controlled***" means possession of either (a) the power to vote, or the beneficial ownership of, 10% or more of any class of voting securities (or other ownership interests) of such Person; or (b) the power to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

> "***Credit Party***" means Borrower, each Guarantor and each other Person (other than Lender) that is or may become a party to this Agreement or any other Loan Document.
>
> "***Obligations***" means all amounts, obligations, liabilities, covenants and duties of every type and description (including for the payment of money), owing by any Credit Party to any Lender Party, or any Secured Swap Provider (other than Excluded Rate Contract Obligations), arising out of, under, or in connection with any Loan Document or any Related Agreement, whether direct or indirect, absolute or contingent, due or to become due, liquidated or not, now existing or hereafter arising, however acquired, and whether or not evidenced by any instrument; ***provided, however***, that Obligations of any Borrower or Guarantor shall not include any Excluded Rate Contract Obligations solely of such Borrower or Guarantor.
>
> "***Person***" means any individual, partnership, corporation, business trust, public benefit corporation, joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venue and any other entity or Government Authority.
>
> "***Related Agreement***" means each agreement, document, and instrument, other than the Loan Documents, now or hereafter existing between, or by, any Credit Party or Affiliate of a Credit Party (including as a successor in interest) and, or for the benefit of, Lender or any Lender Affiliate (including, in each case, as a successor in interest) or any Secured Swap Provider, including Secured Rate Contracts, as any such agreement, document, or instrument may be amended, restated, supplemented, extended or renewed from time to time.

(*Id*., ¶ 30, Ex. C, Ex. 8.1.) Each of the entities comprising Borrower and Guarantor are Credit Parties, as defined in the Security Agreement. (*Id*., ¶ 31.) Queso Borrower is an Affiliate of Borrower because Queso Borrower and Borrower are owned by Jiger Patel and Manisha Patel and managed by Jiger Patel and Manisha Patel. (*Id*., ¶ 32.) The loan documents executed by Queso Borrower in favor of Lender representing two loans in the collective original principal amount of $20,000,000 (together with all documents executed contemporaneously therewith and/or related thereto, as amended and/or modified, the "Queso Loan Documents") are Related Agreements, as

defined in the Security Agreement, because they are agreements and instruments executed by an Affiliate of Borrower in favor of Lender. (*Id.*, ¶ 33.) Because the Queso Loan Documents are Related Agreements, they are part of the definition of Obligations that are secured by the first-priority security interest granted in the Loan Documents. (*Id.*, ¶ 34.) Queso Borrower is in default under the Queso Loan Documents. As of July 2026, an amount not less than $18,318,768.44 is due under the Queso Loan Documents. (*Id.*, ¶ 35.) Additionally, a receiver has been appointed to take possession of, operate and sell Queso Borrower's business. (*See* Case No. 5:26-cv-05612-KNS, Doc. No. 19.)

Upon information and belief, Borrower is actively pursuing a sale of its assets. (*Id.*, ¶ 37.) In the August 20, 2026 letter, Lender notified Borrower that, pursuant to the Security Agreement, Lender's lien on Borrower's assets secures the indebtedness owed by Borrower and Queso Borrower. (*Id.*, ¶ 38.) Borrower disputes that its assets secure the indebtedness owed by Queso Borrower. (*Id.*, ¶ 39, Ex. I.) Upon information and belief, Borrower proposes to pay purported "investors" ahead of amounts owed to Lender. Regardless of whether such purported "investors" are equity holders or unsecured lenders, their interests are subordinate to Lender's first-priority security interest and are not entitled to payment from proceeds of Lender's collateral ahead of Lender. To the extent Borrower incurred new Indebtedness other than the Obligations and trade debt in the ordinary course of business, such Indebtedness constitutes an additional event of default Section 5.12 of the Loan Agreement. (*Id.*, ¶ 40.) On September 3, 2026, Lender reiterated its position that Borrower's assets secure the amounts owed by Queso Borrower. (*Id.*, ¶ 41.)

Plaintiff fully complied with its obligations under the Loan Documents and all conditions precedent to Borrower's obligation to repay the sums due under the Notes and other Loan Documents have been fulfilled or waived. (*Id.*, ¶ 42.)

**C. Basis to Appoint a Receiver Over Borrower**

Compelling grounds exist for the immediate appointment of a receiver over Borrower. (*Id*., ¶ 43.) The Existing Events of Default are ongoing and have not been cured. (*Id*., ¶ 44.) In the Security Agreement, Borrower agreed to the appointment of a receiver in precisely this scenario. Specifically, Borrower agreed as follows:

> If an Event of Default shall have occurred and be continuing and in additional to any other rights and remedies, as matter of right and without notice to Debtor or anyone claiming under Debtor, and without regard to the then value of the UCC Collateral or the interest of Debtor therein, or the solvency of Debtor or the occurrence of any Event of Default described in Section 6.1(f) of the [Reaper] Loan Agreement, lender may seek the appointment of a receiver for Debtor and/or any of the other Credit Parties and/or the UCC Collateral and, to the maximum extent permitted by law, for all other assets of Debtor and such other Credit Parties. Debtor and each other Credit Party waives any right to a hearing or notice of hearing prior to the appointment of a receiver and irrevocably consents to such appointment. Such receiver shall have all of the usual powers and duties of receivers in like or similar cases and all of the powers and duties of Lender in case of entry as provided above and shall continue as such and exercise all such powers until the later of the date of confirmation of sale of the UCC Collateral or the date of expiration of any redemption period, unless such receivership is sooner terminated. All expenses incurred by the receiver or its agents, including obligations to repay funds borrowed by the receiver, shall constitute a part of the Obligations. Any revenues collected by the receiver shall be applied first to the expenses of the receivership, including reasonable attorneys' fees incurred by the receiver and Lender, together with interest thereon at the Default Rate from the date incurred until paid, and the balance shall be applied toward the Obligations or in such other manner as the court may direct.

(*Id*., ¶ 45, Ex. D, § 8.)

Like Queso Borrower, Borrower is managed by Jiger Patel and Guarantor. (*Id*., ¶ 46.) Following numerous failures by Mr. Patel as manager of Queso Borrower and numerous defaults by Queso Borrower, a receiver was appointed to take possession of, operate and sell Queso

Borrower's businesses. (*See* Case No. 5:26-cv-05612-KNS, Doc. Nos. 15, 19.) Those failures include, but are not limited to the following:

a. Failure to provide timely or accurate reporting regarding Queso Borrower's operations;

b. Failure to inform Lender for over a year that Queso Borrower was no longer in good standing with Qdoba Franchisor or that Qdoba Franchisor had issued a notice of default and termination to Queso Borrower;

c. Failure to inform Lender that Queso Borrower entered into an agreement with Qdoba Franchisor wherein Queso Borrower acknowledged that it owed Qdoba Franchisor over $1 million and that Queso Borrower had agreed to sell its interests in all Qdoba restaurants;

d. Failure to cause Queso Borrower to pay over $1 million in sales taxes;

e. Failure to pay rent;

f. Failure to provide the chief restructuring officer appointed at Lender's request with complete and adequate access to Queso Borrower's books and records, all the while retaining complete control over Queso Borrower;

g. While the CRO was in place, Queso Borrower, under Mr. Patel's management, diverted over $300,000 from its bank account(s), which funds were transferred to unknown transferees for unknown purposes;

h. Under Mr. Patel's leadership, and without Lender's knowledge, Queso Borrower experienced significant cash flow issues, leading to Mr. Patel's decision to pay payroll via check, notwithstanding insufficient funds in Queso Borrower's bank

account(s), with the hope that enough deposits would be made by the time employees deposited the checks; and

i. Mr. Patel, without informing Lender, negotiated two letters of intent with the same purchaser, one for the sale of eighteen (18) Qdoba stores securing the indebtedness owed to Lender, and the other for the sale of one (1) store securing indebtedness owed to another lender. But the purchase price for the single store was five times greater than the purchase price for the 18 stores, showing clear favoritism by Mr. Patel of the other lender.

(*Id.*, ¶ 47.) Under Mr. Patel's management, Borrower suffers from the same lack of transparency and has failed and/or refused to provide the financial information that is required to be provided to Lender. (*Id.*, ¶ 48.)

Borrower also suffers from the same cash flow and debt problems as Queso Borrower. As evidenced by the Q2 reporting provided to Lender, Borrower's operations have significantly declined over the last six months under Mr. Patel's leadership. As of June 30, 2026, Borrower had only $84,477 cash on hand, as compared to $536,369 as of December 31, 2025. (*Id.*, ¶ 49.) This amount is insufficient to cover necessary operating expenses, including but not limited to payroll, rent, food vendors and sales taxes. The reporting further indicates that Borrower has significant accrued and unpaid expenses, including accrued wages in the amount of $226,971, accrued sales taxes of $424,105, accrued credit card tips of $32,011. (*Id.*, ¶ 50.)

Upon information and belief, revenues of Borrower's operations have been used for payment of debt owed by one or more entities affiliated with and/or owned by Guarantor and/or Mr. Patel, which suggests that the corporate form is not being observed. (*Id.*, ¶ 51.) Further, upon information and belief and without Plaintiff's prior written consent, Borrower has incurred

indebtedness other than trade debt in the ordinary course of business, agreeing to additional "investments" presumably documented as debt. (*Id.*, ¶ 52.) Given the foregoing, the appointment of a receiver over Borrower, its businesses and all of its assets, wherever located, is necessary to preserve and protect Plaintiff's collateral and to sell the collateral in an orderly and professional manner that maximizes the value of the collateral. (*Id.*, ¶ 53.)

## **ARGUMENT**

Whether to appoint a receiver in this case is governed by Federal Rule of Civil Procedure 66. The appointment of a receiver is an "extraordinary equitable remedy", and a district court has "broad discretion" in its decision to appoint a receiver. *See Lehigh Valley 1 LLC v. Whitehall Fiduciary LLC, as trustee of Whitehall Trust U/T/A/ dated August 1, 2027*, Case No. 24-2627, 2025 WL 1285816, at *2 (E.D. Pa. May 2, 2025) (citations omitted). Other factors to be considered include whether "the property is inadequate security for the loan[,] the mortgage contract contains a clause granting the mortgagee the right to a receiver[,] the continued default of the mortgagor[,] the unstable financial status of the mortgagor[,] and the misuse of project funds by the mortgagor." *Deutsche Bank Trust Co. Americas, as Trustee for the Registered Holders of WFRBS Commercial Mortgage Trust 2013-C18, Commercial Mortgage Pass-Through Certificates, Series 2013-C18 v. Royersford Hotel Group LLC*, Case No. 24-5769, 2024 WL 4979268, at *2 (E.D. Pa. Dec. 4, 2024) (citing *Wells Fargo Bank, N.A. v. CCC Atlantic, LLC*, 905 F. Supp. 2d 604 (D.N.J. 2012)). When "the facts support the appointment of a receiver[,]" the court is not required to hold a hearing. *Lehigh Valley 1 LLC v. Whitehall Fiduciary LLC, as trustee of Whitehall Trust U/T/A/ dated August 1, 2027*, Case No. 24-2627, 2025 WL 1285816, at *2 (E.D. Pa. May 2, 2025) (citations omitted).

Though not dispositive, "[p]rovisions granting a right to the appointment of a receiver

weigh heavily in favor of appointing one[.]" *See Lehigh Valley*, 2025 WL 1285816, at *3 (citations omitted) (granting lender's motion to appoint a receiver where borrower agreed in the mortgage to the appointment of a receiver upon and event of default and there was no dispute that an event of default occurred); *see also Deutsche Bank*, 2024 WL 4979268, at *2 (E.D. Pa. Dec. 4, 2024) (explaining that the other factors "may be applied in a less stringent manner if a loan agreement expressly allows for the lender to apply for a receiver in the event of a default.").

**A. Plaintiff is Entitled to a Receiver over Borrower**

Here, Borrower consented to the appointment of a receiver upon the occurrence of an event of default in the Security Agreement. (Compl., ¶ 45, Ex. D, § 8.) The Existing Events of Default are ongoing. (*Id.*, ¶ 26.) Therefore, this factor weighs heavily in favor of the appointment of a receiver.

The other factors also weigh in favor of appointing a receiver, primarily Borrower's unstable financial status, outstanding debts, including unpaid sales taxes, and misuse of funds. As evidenced by the Q2 reporting provided to Lender, Borrower's operations have significantly declined over the last six months under Mr. Patel's leadership. As of June 30, 2026, Borrower had only $84,477 cash on hand, as compared to $536,369 as of December 31, 2025. (*Id.*, ¶ 49.) This amount is insufficient to cover necessary operating expenses, including but not limited to payroll, rent, food vendors and sales taxes. The reporting further indicates that Borrower has significant accrued and unpaid expenses, including accrued wages in the amount of $226,971, accrued sales taxes of $424,105, accrued credit card tips of $32,011. (*Id.*, ¶ 50.) Thus, the reporting shows that Borrower's financial status is in a state of rapid decline. To the extent that Borrower is attempting to sell its assets, failure to pay operating expenses as and when due could hurt the eventual sale price and puts the enterprise, and the Lender's collateral, at risk.

Also contributing to Borrower's financial instability is the fact that Borrower continues to be managed by Mr. Patel, who has proven himself to be an unreliable manager. (*Id.*, ¶¶ 47-48.) Lender recently obtained a receiver over Queso Borrower as a result of Mr. Patel's lack of transparency and mismanagement, even after the appointment of a CRO. (*Id.*, ¶ 36.) The same lack of transparency and mismanagement plagues Borrower's relationship with Lender. Furthermore, upon information and belief, and notwithstanding Borrower's already tenuous financial status, Mr. Patel has authorized the use of proceeds from Borrower's operations to pay expenses for other related entities. (*Id.*, ¶ 51.) Plaintiff's request for a receiver is particularly urgent because Mr. Patel, through his counsel, has threatened to drive the value of Borrower's assets into the ground apparently to spite Plaintiff because he disagrees with Plaintiff's contention that Borrower's assets also secure the indebtedness owed under the Queso Loan Documents—which is the very subject of this case. (*See id.*, ¶ 41, Ex. J.) This threat, coupled with the documented decline in Borrower's financial stability evidence the immediate need for a third-party receiver to manage and sell Borrower's assets.

Given that Borrower agreed to the appointment of a receiver upon the occurrence of a default, the Existing Events of Default are ongoing, and that the other factors considered by courts in the Third Circuit weigh in favor of the appointment of a receiver, the Court should appoint a receiver over Borrower. Given Mr. Patel's control of Borrower and demonstrated inability to properly maintain, operate and sell Borrower's assets, Plaintiff contends that there is not a lesser remedy available to protect its interests and that only the removal of Mr. Patel as manager and appointment of a receiver can adequately preserve and protect the value of the collateral. Thus, the appointment of a receiver is necessary to preserve and protect Plaintiff's collateral and to sell the collateral in an orderly and professional manner that maximizes the value of the collateral and

appropriately distributes the proceeds to creditors. As a result of the ongoing defaults, lack of transparency and financial decline of Borrower under Mr. Patel's leadership, an independent receiver should be appointed. Absent the immediate appointment of a receiver, there is an immediate threat that Plaintiff's collateral will be dissipated.

**CONCLUSION**

WHEREFOR, for the foregoing reasons, Plaintiff respectfully requests that the Court enter an order appointing a receiver over Borrower and granting Plaintiff such other and further relief as is just and proper.

Dated: September 9, 2026

Respectfully submitted,

/s/ *James E. Van Horn*_____
James E. Van Horn
Pennsylvania Bar No. 88715
**Barnes & Thornburg LLP**
555 12th St NW, Suite 1200
Washington, DC 20004
Telephone: (202) 371-6531
JVanHorn@btlaw.com

Lisa Wolgast (pro hac forthcoming)
**Barnes & Thornburg LLP**
3340 Peachtree Road, N.E., Suite 2900
Atlanta, Georgia 30326-1092
Telephone: (470) 832-7535
Lisa.Wolgast@btlaw.com

*Attorneys for Bank Midwest, a division of NBH Bank*